**HAWAII'S THOUSAND FRIENDS, a Hawaii non-profit corporation; and Sierra Club, a California non-profit corporation, Plaintiffs,**

v.

**CITY AND COUNTY OF HONOLULU, a Hawaii municipal corporation, Defendant.**

Civ. Nos. 90–00218 HMF, 91–00739 ACK.

United States District Court, D. Hawaii.

April 27, 1993.

Paul P. Spaulding, Denise E. Antolini, Eric S. Walters, Sierra Club Legal Defense Fund, Inc., Honolulu, HI, for plaintiffs.

Richard D. Wurdeman, Cheryl K. Okuma–Sepe, Tracy Lowell Wolf, Corp. Counsel, City and County of Honolulu, Honolulu, HI, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

FONG, District Judge.

The above-entitled case came on for trial before this court on January 5, 1993. Plaintiffs Hawaii's Thousand Friends and Sierra Club ("plaintiffs") appeared through their attorneys Sierra Club Legal Defense Fund, Inc., Paul P. Spaulding, III, Denise E. Antolini and Eric S. Walters. Defendant City and County of Honolulu ("the city" or "defendants") appeared through Deputy Corporation Counsel Cheryl K. Okuma–Sepe and Tracy Lowell Wolf.

On March 27, 1990, plaintiffs filed a complaint for injunctive relief and civil penalties against the city arising out of allegedly illegal bypasses of sewage treatment equipment at the city's Honouliuli wastewater treatment plant ("*Honouliuli I*"). On July 3, 1991, this court entered an order in which it granted plaintiffs' motion for partial summary judgment on the issues of standing, subject matter jurisdiction, and the city's liability for 104 violations of the Clean Water Act: 52 illegal bypasses and 52 failures to report those bypasses.

On December 24, 1991, plaintiffs filed a second complaint for declaratory judgment, injunctive relief and civil penalties against the city, which also relates to the city's operation of its Honouliuli plant ("*Honouliuli II*"). Specifically, plaintiffs alleged that the city has violated the Clean Water Act on a continuous basis since July 1, 1988 by failing to treat sewage at secondary levels. On February 28, 1992, this case was consolidated with the earlier lawsuit. On May 8, 1992, the court granted plaintiffs' motion for summary judgment on liability, finding that the city

has violated the secondary treatment requirements of both the Act and the Honouliuli National Pollution Discharge Elimination System ("NPDES") permit incorporating the Act's requirements on a daily, continuous basis since July 1, 1988.

The purposes of this trial are to establish the precise number of secondary treatment violations, to examine what remedies are appropriate to address both the bypass and secondary treatment violations, and to determine appropriate civil penalties pursuant to 33 U.S.C. § 1319(d).

This court, having examined the documentary and other evidence introduced, heard the oral testimony, considered the arguments of counsel, and reviewed the written memoranda of the parties, makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

### I. BACKGROUND

#### A. *The Honouliuli Plant*

1. This lawsuit concerns the Honouliuli wastewater treatment plant ("the Honouliuli plant" or "the plant"), which is a sewage treatment facility owned and operated by the City and County of Honolulu ("the city"), and originally designed to treat 25 million gallons per day ("mgd") of sewage. It is one of twelve sewage treatment plants on Oahu operated by the city.

2. The plant is located in Ewa Beach, Honolulu, Oahu, Hawaii, and treats wastewater from the southwestern Oahu metropolitan area, ranging from Halawa to Makakilo. The plant's service area is predominantly residential and agricultural in character, with some commercial areas.

3. The Honouliuli plant currently is a "primary" sewage treatment facility. After sewage is pumped to the plant through the collection system, it receives preliminary treatment consisting of screening to remove large objects, grit removal and pre-aeration to facilitate grease and floatables removal. The sewage then enters the primary clarifi-

ers, which are designed to remove suspended solids and organic materials through sedimentation to the bottom of the tank and by removal of floatables from the surface. The sewage then travels through an effluent screen (with a ¼ inch square mesh) and leaves through the outfall pipe. The effluent sewage is dispersed into the ocean waters through a multiport diffuser.

4. The plant currently processes an average of approximately 23–25 mgd. The treated sewage is then discharged through an ocean outfall into Mamala Bay, offshore of Ewa Beach and adjacent to civilian and military beaches from Iroquois Point to Barber's Point.

5. The Honouliuli plant is the second largest municipal wastewater discharge facility in the State of Hawaii.

#### B. *Parties*

6. Plaintiff Hawaii's Thousand Friends is a non-profit corporation concerned with water and land use, organized under the laws of the State of Hawaii.

7. Plaintiff Sierra Club is a national non-profit conservation organization. It has a Hawaii chapter that currently has more than 4,000 members.

8. In its July 3, 1991 order, the court found that some members of Hawaii's Thousand Friends and Sierra Club reside near and use the Ewa beaches and coastal waters as more precisely explained therein. Accordingly, the court held that plaintiffs satisfy the organizational and personal standing requirements for maintaining these citizen lawsuits under the Clean Water Act.

9. Defendant City and County of Honolulu ("the city") is a Hawaii municipal corporation that owns and operates the Honouliuli plant. The Wastewater Management Division ("WWMD") of the Department of Public Works is the city division that oversees operation of the Honouliuli Plant. One branch of the WWMD, the Wastewater Treatment and Disposal branch ("WWT & D"), is responsi-

---

1. Any finding of fact more appropriately designated as a conclusion of law shall be considered also a conclusion of law; and any conclusion of law more appropriately designated as a finding of fact shall be considered also as a finding of fact.

ble for the administration of the city's treatment plants.

## C. Notice of Citizens' Suit

10. On November 28, 1989, plaintiffs served written notice on the city, the United States Environmental Protection Agency ("EPA") and the State of Hawaii Department of Health ("DOH") of their intent to file a citizen's lawsuit on the claims set forth in the complaint in *Hawaii's Thousand Friends v. City and County of Honolulu,* Civil No. 90–00218 HMF (*"Honouliuli I"*).

11. This written notice is required by section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).

12. The November 28, 1989 written notice was received by the city, EPA and DOH.

13. After November 28, 1989, neither EPA nor DOH commenced and diligently prosecuted a court action to address the violations in this notice.

14. Plaintiffs filed their complaint in *Honouliuli I* on March 27, 1990, more than sixty days after service of the November 28, 1989 notice.

15. As explained in the court's September 28, 1990 and July 3, 1991 orders, the allegations set forth in the *Honouliuli I* complaint satisfied the jurisdictional doctrine of *Gwaltney of Smithfield v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) ("the *Gwaltney* doctrine").

16. On October 16, 1991, plaintiffs served written notice on the city, EPA, and DOH of their intent to file a citizens' lawsuit on the claims set forth in the complaint in *Hawaii's Thousand Friends v. City and County of Honolulu,* Civil No. 91–00739 ACK (*"Honouliuli II"*).

17. The October 16, 1991 written notice was received by the city, EPA and DOH.

18. After October 16, 1991, neither EPA nor DOH commenced and diligently prosecuted a court action to address the violations in the October 16, 1991 notice.

19. Plaintiffs filed their complaint in *Honouliuli II* on December 24, 1991, more than sixty days after service of the October 16, 1991 notice.

20. The violations set forth in the *Honouliuli II* complaint have continued on a daily basis since October 16, 1991 and therefore satisfy the jurisdictional requirements of the *Gwaltney* doctrine.

## D. The Clean Water Act

21. In 1972, Congress amended the Clean Water Act, 33 U.S.C. § 1251, *et seq.* ("the Act"), to create the National Pollution Discharge Elimination System ("NPDES"), which requires a NPDES permit for any person to discharge pollutants into navigable waters of the United States. 33 U.S.C. § 1311(a). The program originally required all publicly owned treatment works ("POTWs") to achieve effluent limitations based on secondary treatment by July 1, 1977.

22. Effluent limitations have been set by the Environmental Protection Agency pursuant to 33 U.S.C. § 1314(d)(1). The EPA defines "secondary treatment" to require the removal of 85% of BOD and SS[2] in the effluent, average concentrations of 30 mg/1 on a 30–day average for both BOD and SS, average concentrations of 45 mg/1 on a seven-day average for both BOD and SS, and a pH level between 6.0 and 9.0. 40 C.F.R. §§ 133.102(a) and (b).

23. Sewage plant engineers generally refer to secondary treatment as the use of biological treatment (i.e., digestion by microorganisms) of sewage in addition to the physical treatment processes provided by primary treatment.

24. Primary treatment, the lowest level of wastewater treatment, is generally defined as the physical treatment of effluent through screening and gravity settling in sedimentation tanks. It is defined by the Clean Water Act as at least 30% removal of BOD and SS. 33 U.S.C. § 1311(h). Advanced primary

---

**2.** "BOD" refers to biochemical oxygen demanding material. "SS" refers to suspended solids.

*See* paras. 63 & 64 for fuller definitions.

treatment normally involves the addition of chemicals to enhance settling and coagulation of sewage matter and removes a higher percentage of BOD and SS than primary treatment.

25. The Act has been amended several times to extend the secondary treatment compliance deadline for POTWs to its current and final date of July 1, 1988. No extensions can be granted beyond that date by the EPA or a state. 33 U.S.C. § 1311(i)(1).

26. In 1977, Congress amended the Act to allow municipalities that discharge into deep marine waters to obtain NPDES permits for discharge at less than secondary treatment effluent limitations if they could establish that it would not harm the marine environment. 33 U.S.C. § 1311(h).

27. On June 15, 1979, the EPA promulgated regulations governing § 301(h) applications. 44 Fed.Reg. 34,784–34,832. In response to *NRDC v. USEPA*, 656 F.2d 768 (D.C.Cir.1981), the 301(h) regulations were amended on November 26, 1982, to allow municipalities to submit a reapplication following a tentative decision to propose changes in treatment level or outfall and diffuser design. 40 C.F.R. Part 125.59(d).

### E. *The State NPDES Program*

28. Pursuant to 33 U.S.C. § 1342, the Administrator of the EPA has delegated to the State of Hawaii the power to issue certain National Pollution Discharge Elimination System ("NPDES") permits to dischargers in Hawaii. DOH is the state government department that administers the NPDES program in Hawaii.

29. The state program for issuance of NPDES permits must comply in all respects with, and must prescribe no less stringent effluent limitations than, those set forth in the Act itself. 33 U.S.C. § 1342(b).

30. In issuing an NPDES permit, both DOH and EPA are required to prescribe effluent limitation conditions that meet the discharge requirements set forth in the Act. 33 U.S.C. § 1342(a) and (b).

31. All permits issued by the state must also comply with Section 308 of the Act, 33 U.S.C. § 1318, which requires NPDES permittees to establish and maintain records; install, use and maintain monitoring equipment; sample effluent; and report on a regular basis to DOH and EPA regarding their discharge of pollutants using discharge monitoring reports ("DMRs"). 33 U.S.C. § 1342(b)(2)(A).

32. The city has filed DMRs with DOH on a periodic basis since it first received an NPDES permit for the Honouliuli plant. In these DMRs, the city is required to record the daily, weekly, and monthly measurements required by its permit.

### F. *Development of the Honouliuli Plant*

33. In April 1970, the city engaged a consortium of engineering consultants to undertake a comprehensive study of the present and future sewage treatment needs of Oahu. The consortium, assisted by a six-member Board of Advisors, issued its final report in April 1972, which was entitled "Water Quality Program For Oahu With Special Emphasis On Waste Disposal" (the "WQPO report").

34. The WQPO report found that sewage treatment on Oahu was inadequate in many areas (indeed, raw untreated sewage was being discharged into some receiving waters), resulting in a gradual deterioration of the water quality of some of the coastal waters receiving the effluent. According to the Report, some areas—including Mamala Bay, Pearl Harbor and Kaneohe Bay—had already manifested this deterioration and required construction of new treatment facilities.

35. The WQPO report concluded that a wastewater treatment and disposal system was urgently needed and recommended an overall plan for water quality management on Oahu. Specifically, the report recommended that a secondary treatment disposal sewage facility be built at Honouliuli to handle waste flows from Halawa to the Ewa areas, "with primary consideration of reclamation for irrigation of sugar cane in the Ewa District." WQPO report at II–17. The report also contemplated that an ocean disposal system would be required at a later

time to handle effluent in excess of the reuse need. The report suggested that because of the favorable current regime and density structure at reasonable distances from shore in Mamala Bay, "the minimum degree of treatment required for the Sand Island or Honouliuli systems (discharge into deep waters off Ewa Beach), is advanced primary, if reclamation is not considered." *Id.* at XIII–15.

36. Consistent with the recommendation of the WQPO report, the city and its consultant, the R.M. Towill Corporation ("Towill"), with assistance from various state and federal agencies, planned a secondary treatment plant (using conventional activated sludge technology) at the Honouliuli site.

37. The land for the Honouliuli plant itself was acquired by the federal government in 1974. It was formerly a portion of Barber's Point Naval Air Station.

38. In June 1975, the city issued a Final Environmental Impact Statement for the Honouliuli plant, which had been prepared by Towill. The "proposed action," on which the environmental analyses were based, was the construction of "a secondary activated sludge wastewater treatment plant" and an ocean outfall system.

39. In August 1976, Towill, pursuant to a contract with the city, issued a final design report for a secondary treatment plant at Honouliuli. The city then proceeded to have detailed plans and specifications drawn for construction of this plant.

40. The WQPO report had also recommended that a Honouliuli outfall/diffuser system be built to discharge treated sewage into West Mamala Bay. In 1976, to implement this recommendation, the city and Towill issued a design report for construction of this outfall (the "outfall design report").

41. In the outfall design report, Towill proposed an outfall system that consisted of 9,166 feet of 84–inch outfall pipe on land and 8,760 feet of 78–inch outfall pipe along the ocean bottom. The outfall terminated in a 1750–foot diffuser at a depth of approximately 200 feet. The diffuser had a graduated pipe diameter, decreasing to 48 inches at the end in order to maintain adequate velocity of the effluent flowing through the pipe. The diffuser had uniformly spaced ports through which the effluent would be expelled into the receiving waters by pressure of its flow.

42. From approximately 1977 to 1980, the city built the outfall recommended by Towill (with 84–inch and 78–inch pipe) to discharge up to 112 mgd of treated sewage effluent.

43. In the late 1970s, after completing preparations to build a secondary treatment plant at Honouliuli, the city decided to apply for a waiver of the secondary treatment requirement pursuant to the newly enacted § 301(h) of the Act (the "301(h) waiver"). The city submitted an application for an NPDES permit to build an "advanced primary" plant on September 7, 1979. The "advanced primary" treatment was to be accomplished through use of a polymer (chemical) feed system to enhance the pollutant removal rates provided by primary treatment equipment.

44. On October 31, 1980, EPA issued an NPDES permit to the city that governed the operation of the Honouliuli plant until June 30, 1985. This permit imposed secondary treatment effluent limitations (85% removal rates and 30 mg/1 concentration limitations) on the plant for suspended solids and organic materials in the effluent.

45. On March 6, 1981, EPA notified the city that it had deferred consideration of the waiver applications for the Kailua, Kaneohe and Waianae sewage plants. EPA stated that it would not require secondary treatment at those plants pending review of the waiver applications. EPA further explained that any NPDES permit or § 309(a)(5)(A) extension orders setting interim effluent limitations (based on past performance and existing plant capabilities) would remain in effect until the waiver was granted or denied. This letter did *not* include the waiver application for the Honouliuli plant as one of the deferred applications.

46. In September 1981, the EPA tentatively denied the city's 301(h) waiver proposed for suspended solids (with effluent limitation of 115 mg/1) and tentatively granted a waiver for BOD materials (200 mg/1).

47. The city had new plans and specifications drawn for a primary treatment plant and began building it in 1982. The plant was completed and began treating sewage in December 1984. In doing so, the city chose to take the chance that its 301(h) waiver would be granted and thus did not build the more expensive secondary treatment facility which it would not be required to have if and when the 301(h) waiver is ultimately granted.

48. The city has recently completed a 13 mgd expansion of the Honouliuli plant. The plant now has a total of four primary clarifiers—three of which are generally in use at a given time—and can process an average flow of 38 mgd.

49. The area serviced by the Honouliuli plant is one of the fastest growing areas on Oahu. According to Dr. John Lewin, Director of DOH, it is "the area of planned major growth on the Island of Oahu." There are numerous residential developments, which include golf courses and commercial districts, being planned for and built in this area.

50. As the population of the Honouliuli service area grows, the flow of pollutants to the Honouliuli Sewage plant will grow in a corresponding manner.

51. The most recent "optimistic" city projections indicate that the sewage flows into the plant will grow from their current level of 23–25 mgd to approximately 42 mgd by 1995 and 51 mgd by the year 2000. These projections include development plans that have already been accepted by the city, as well as plans presently proposed by the developers. More conservative city projections based only on currently approved development plans indicate that sewage flows will reach only approximately 31 mgd by 1995, and 33 mgd by 2000.

52. The planned major growth in the Ewa plain area has also raised concerns about water needs in the area. Dr. Lewin testified that it would be logical to conserve water on the Ewa plain by reusing the wastewater treated at the Honouliuli plant as irrigation water and/or to recharge the aquifer. Dr. Lewin testified that secondary treatment, coupled with some disinfection process, is the sewage treatment level necessary to pursue reuse or recharge of the aquifer.

53. The city has begun planning for a secondary treatment facility capable of processing 13 mgd for effluent reuse. Construction of this facility is scheduled to be completed in 1996. The Board of Water Supply has projected that 12.5 mgd of the effluent can be reused.

54. The city plans to treat at secondary levels only the amount of effluent that will be reused. For example, if the reuse demand is only for 5 mgd, then only 5 mgd will receive secondary treatment.

G. *Required Effluent Limitations for the Honouliuli Plant*

1. *Interim Effluent Limitations*

55. In January 1982, the Honouliuli outfall began accepting sewage flows, as ordered by the State, that were diverted from Pearl Harbor. The partially completed plant discharged effluent that had only received preliminary treatment (screening and degritting). Over the next two years, eleven other sewage flows were diverted into this outfall before the treatment plant itself was completed.

56. On February 19, 1982, DOH issued the city a Notice and Finding of Violation for the plant's failure to provide secondary treatment. On December 15, 1982, DOH issued the city an administrative order requiring the city to complete construction of the primary treatment units by December 31, 1982, and of the solids handling units by December 31, 1984. The order also levied a fine of $100,-000 against the city for the continuous discharge, payment of which was suspended as long as construction was completed on time.

57. On January 30, 1985, DOH issued an amendment to the December 1982 order (the "1985 consent order"). The 1985 consent order established interim effluent limitations of 200 mg/1 BOD and 105 mg/1 SS for the Honouliuli plant, as proposed by the city in the municipal compliance plan it submitted to DOH. It also established a construction schedule for the completion of secondary treatment facilities, to take effect upon the denial of the city's 301(h) waiver application.

58. The interim effluent limitations and construction schedule were developed with EPA Region IX approval and directions from EPA headquarters. EPA and DOH intended the consent order to be valid after July 1, 1988. At the time the consent order was drafted, it was EPA Region IX policy to issue these orders administratively rather than through judicial means.

### 2. *1985 NPDES Permit*

59. On July 1, 1985, DOH issued NPDES permit no. HI 0020877 ("the 1985 permit") to the city for the Honouliuli plant. The permit recites that it will expire by its terms at midnight on June 30, 1990.

60. The permit authorized the plant to discharge wastewater into Mamala Bay from a sewage outfall, known as the "Barber's Point outfall," so long as certain specified conditions were met.

61. The effluent limitations contained in the plant's NPDES permit are pegged to the *secondary treatment* requirements of the Clean Water Act. The permit does not authorize the discharge of primary or advanced primary sewage effluent.

62. The permit contains ten separate effluent limitations at issue in this case: five each for biochemical oxygen demanding ("BOD") materials and for suspended solids ("SS").

63. BOD materials are organic substances in wastewater effluent that bind oxygen, thereby depleting oxygen in water and degrading water quality.

64. Suspended solids are solid particulates contained in wastewater effluent.

65. The permit prohibits the plant from discharging more than an average of 6,248 pounds per day of BOD materials or SS over a 30–day period (limitation nos. 1 and 2), or more than an average of 9,371 pounds per day of BOD or SS in any seven-day period (limitation nos. 3 and 4).

66. The permit also prohibits the plant from discharging effluent with concentrations of BOD materials or SS that exceed an average concentration of 30 milligrams/liter per day over a 30–day period (limitation nos. 5 and 6) or more than an average concentration of 45 milligrams/liter per day in any seven-day period (limitation nos. 7 and 8).

67. The permit also imposes limitations on the "removal efficiency performance" of the plant for both BOD and SS. It requires that the plant remove 85% of all BOD materials and SS entering the plant (limitation nos. 9 and 10).

68. As the city admits, the Honouliuli plant has never met, and is not designed to meet, the secondary treatment effluent limitations contained in its NPDES permit.

69. The city has operated the Honouliuli plant on the assumption that the only effluent limitations the plant must meet are the interim limitations established in the 1985 consent order.

70. Despite the apparent belief by the city, the DOH, and the EPA that the effluent limitations established in the 1985 consent order were effective after July 1, 1988, the court has previously held that the July 1, 1988 compliance deadline could not be extended administratively. July 3, 1991 Order, at 21–23; *see* 33 U.S.C. § 1311(i)(1).

### H. *301(h) Waiver Process for the Honouliuli Plant*

71. On or about September 7, 1979, the city filed an application for a 301(h) waiver permit from the EPA.

72. On or about September 8, 1981, EPA tentatively *denied* the portion of the city's 301(h) waiver request relating to a variance for suspended solids. EPA tentatively granted the portion of the city's request for a waiver from BOD secondary treatment requirements.

73. On October 31, 1983, the city reapplied to EPA for a waiver of secondary treatment requirements at Honouliuli, as permitted under the amended regulations. By this application, the city downgraded its requested plant to "primary" treatment, rather than its original waiver proposal of "advanced primary" treatment.

74. The EPA tentatively granted the amended waiver for both BOD and SS on April 4, 1988.

75. Two public hearings were held to receive testimony on the tentative grant of the 301(h) waiver for primary treatment. On May 2, 1991, the EPA issued a "final determination" granting the city a 301(h) waiver permit.

76. On June 5, 1991, Sierra Club, Hawaii's Thousand Friends and Save Ewa Beach Ohana filed an evidentiary hearing request on the waiver permit decision.

77. On June 5, 1991, the city also filed an evidentiary hearing request on certain portions of the decision.

78. These evidentiary hearing requests automatically stayed the effectiveness of the proposed 301(h) permit. 40 C.F.R. § 124.-15(b)(2). Thus, the proposed waiver never became final and effective.

79. On May 12, 1992, the city filed an emergency petition for writ of mandamus in the Court of Appeals for the Ninth Circuit, requesting that the court direct EPA to act expeditiously on the evidentiary requests filed by plaintiffs and by the city. This petition was filed four days after this court held that the city has been in continuous violation of the secondary treatment requirement.

80. On June 9, 1992, one month after the Court entered its summary judgment order finding secondary treatment violations in this case, the city withdrew its evidentiary hearing request.

81. On July 31, 1992, EPA granted plaintiffs' evidentiary hearing request in full. An Administrative Law Judge ("ALJ") was assigned on August 19, 1992. The ALJ requested that the city, the EPA, and plaintiffs submit position statements and suggested hearing dates by January 15, 1993. The ALJ will now conduct hearings on a wide range of waiver issues. This is a *de novo* proceeding in which the city will carry the burden of proof to demonstrate its entitlement to a waiver. This hearing process, with associated appeals, may not be completed until 1995 or 1996.

82. While the 301(h) evidentiary hearing requests are pending before EPA, the proposed waiver permit is not effective. Accordingly, the city does not now have authority to discharge effluent at the treatment levels set forth in the proposed waiver permit.

## II.  BYPASS INCIDENTS

A.  *Regulations and Reporting Procedures for Bypasses at Honouliuli*

83. Among other things, the permit specifically prohibits any "bypass" of sewage by the plant. Permit, Section II.A.10.d.[3] A "bypass" is defined as "the intentional diversion of waste streams from any portion of a treatment facility." Permit, Section II.A.10.a(1).

84. Sewage flow into a wastewater plant that is diverted to the effluent channel after receiving only partial treatment and is sent through the outfall pipe to ocean waters constitutes a bypass.

85. Bypasses are allowed only if: (1) the bypass does not cause effluent limitations to be exceeded; and (2) the bypass is for "essential maintenance to assure efficient operation." Permit, Section II.B.10.b. These permitted bypasses are not subject to the notice requirements.

86. The permit requires the city to immediately report to DOH "any noncompliance which may endanger health or the environment." Permit, Section II.A.2. In addition, the plant must give immediate notice to the major news wire services (UPI and AP) for broadcast so that the public can be alerted to the bypass event. Within five days, the plant must make a written report of the incident, which includes: a description of the noncompliance and its cause; the period of noncompliance, including the dates and times, and expected duration; and steps taken or planned to reduce, eliminate, and prevent recurrence of the noncompliance.

87. The permit also requires that, for an *anticipated* bypass, defendant must submit prior notice of said bypass to DOH, if possible, at least ten days before the date of the bypass. Permit, Section II.B.10.c(1).

3.  The Permit tracks the language of 40 C.F.R. § 122.41(m) in defining a bypass.

88. In the event of an *unanticipated* bypasses, notice must be given in the manner set forth in Section II.A.2 of the permit, as described above. Section II.A.2.a. specifies that any unanticipated bypass that exceeds any effluent limitation in the permit must be reported immediately.

89. The city is also obligated to comply with an internal directive of its WWT & D branch regarding sewage bypasses (the "directive"). This directive requires the Honouliuli plant to report *immediately all* emergency or anticipated "bypasses" or "overflows" of raw or partially treated sewage. These reports must be made verbally to someone in the chain of command (from branch superintendent to division chief to department director) in order to assure prompt notification of city officials, DOH, and the public. In addition, a wastewater bypass report form must be submitted to the branch superintendent on the first working day after each bypass occurrence.

90. The directive further requires that for a *planned* discharge of raw or partially treated sewage (i.e., overflows or bypasses due to repair, construction or testing), a wastewater bypass report must be submitted to the Water Quality section (a section of the WWMD) at least one month before the planned overflow or bypass.

91. The DOH investigation of the bypass incidents at Honouliuli concluded that the city did not follow the provisions of its own directive before or during the October–November 1989 bypass episodes.

92. The city is further obligated to comply with separate procedures promulgated by the director and chief engineer of the city's Department of Public Works, contained in a document entitled "Standard Operating Procedure (SOP) for Reporting Bypass of Sewage or Discharge of Partially-Treated [sic] Sewage October 28, 1983 (Revised June 29, 1987)." This document also contains specific oral and written notification, media announcement, and posting procedures similar to those above for both emergency and anticipated bypasses.

93. All of the reporting and notification procedures set forth in the directive and the SOP are designed to protect the public and the ocean environment from the adverse effects of the discharge of inadequately treated sewage. Upon notification, DOH and the various city departments can implement measures to minimize or mitigate the bypasses, closely monitor the effluent and take other steps to warn the public (through posted signs or media announcements), and thereby significantly decrease the public health dangers and environmental impacts. Noncompliance with the internal procedures does not constitute a violation of the NPDES permit or the Clean Water Act, but is relevant to whether the city acted in good faith.

### B. Bypasses at Honouliuli in October and November 1989

94. The Honouliuli plant is designed to process an average daily capacity of 25 million gallons of effluent. Although the plant can handle occasional peak flows exceeding that amount, the city knew that the plant could bypass preliminarily treated sewage when there were sustained heavy flows, particularly if portions of plant treatment equipment were out of service. These bypasses could be expected to occur during periods of heavy rain and/or heavy usage (such as in the early evening or on weekends). Flows at the Honouliuli plant increase during heavy rains because of leaking sewer collection pipes and "manholes" that allow rain saturating the ground to flow into the sewer system.

95. According to plant employees, bypasses could occur at the plant, even with *two* primary clarifiers in operation, when flows exceeded 38 mgd. When only one primary clarifier was in operation, bypasses would occur when flows reached the 25.5 mgd level.

96. The Honouliuli plant periodically schedules maintenance of its wastewater treatment equipment, including the plant's two primary clarifier units. When these repairs take place, the plant has a lower threshold level at which bypasses will take place because each primary clarifier treats an average of approximately 13 mgd.

97. On or about July 19, 1989, the city prepared an internal wastewater bypass report for an anticipated "bypass" of "partially treated wastewater" into Mamala Bay from

the Honouliuli plant over a 30–45 day period starting on August 27, 1989. That internal report, prepared by Norman Ching, the plant superintendent ("Ching"), was circulated to and approved by numerous city WWMD employees. The report identified the cause of the bypass to be the "preventive maintenance" of primary clarifier #1. The plan was to repair the deteriorated coating of the concrete and metal surfaces of clarifier #1, which protects against corrosion.

98. On or before July 27, 1989, the city notified DOH by letter that it planned to perform "scheduled preventive maintenance" for one of the two primary clarifiers for the plant. The city indicated that the remaining primary clarifier would be "hydraulically overload[ed,] ... which may decrease clarifier performance." The city did *not* mention that it anticipated bypasses might occur as a result of the maintenance. The letter does not even use the word "bypass." A hydraulic overload occurs when flows inside a primary clarifier rise above design levels, which may decrease detention time in the tank and reduce the efficiency of removal. According to DOH enforcement officer Paul Ciesla ("Ciesla"), a hydraulic overload of a clarifier is "vastly different" and "far less serious" than a bypass.

99. On or about August 4, 1989, the city received permission from DOH to perform this "scheduled preventative maintenance" during a period between August 27, 1989 through October 11, 1989. DOH acknowledged that the maintenance work would create a hydraulic overload on primary clarifier #2, and urged the city to complete the work as expeditiously as possible.

100. After this notification to DOH, the city twice rescheduled the maintenance work on primary clarifier #1. On September 5, 1989, the city notified DOH that it had revised its schedule for maintenance to commence about six weeks later, on October 16, 1989 (instead of August 27, 1989). The city later moved this date up to October 3, 1989.

101. The city was aware that flows into the plant vary seasonally and that October is typically a month of high influent flows.

102. At no time did the city notify DOH that it anticipated that any bypasses would take place during the repair period.

103. On October 3, 1989, the city began its scheduled repairs, and clarifier #1 was taken off-line. Bypasses of the plant's remaining primary clarifier began occurring immediately—flows backed up and spilled from the "influent" channel (between the pre-aeration tanks and the primary clarifiers) over the "bypass weir" into the plant's "effluent channel." In other words, sewage that had received only preliminary treatment and was on its way to the primary clarifier spilled over into the sewage that was leaving the plant after treatment. The bypassing sewage skipped primary treatment altogether. The bypass weir was adjustable and designed to allow excess flow to enter the effluent channel directly, bypassing the clarifiers, in order to prevent hydraulic overload to the clarifiers.

104. Due to the heavy rainstorm flows that occurred on October 3, 1989, which contributed to the bypassing, the plant stopped the maintenance work on primary clarifier #1 and put both clarifiers back on-line at approximately 8:45 p.m.

105. Primary clarifier #1 was taken off-line again on October 4, 1989, at about 12:30 p.m. Bypasses over the bypass weir continued on a daily basis until clarifier #1 was placed back in service on November 23, 1989.

106. A total of approximately 106 million gallons of preliminarily treated sewage was bypassed on 52 days during this period. The daily bypasses ranged as high in amount as 8.37 million gallons on October 3, 1989, and there were 23 separate days on which more than two million gallons of preliminarily treated sewage were bypassed. The bypass flows were the highest on weekends.

107. The plant was unable to put primary clarifier #1 back in service quickly once the recoating work had begun and equipment was placed in the tank. The only measure undertaken by the plant to attempt to mitigate the bypasses was to initiate procedures to throttle back the pumps to keep the flow below 25 mgd whenever possible. This manipulation of the pumps was constrained by

the fact that sewage could back up in the collection system or in the preliminary treatment equipment if the flows were overly restricted. The plant did not monitor the bypasses at the bypass weir itself. Plant employees, however, did take effluent samples four days a week to monitor the levels of BOD and SS; the levels never exceeded the interim effluent limitations, but were in excess of secondary treatment limitations.

108. The 106 million gallons of preliminarily treated sewage bypassed did not receive the complete primary treatment. The sewage was only degritted, screened, and aerated (or "conditioned") prior to being bypassed into the plant's effluent channel. The effluent screens did remove large floatables from the sewage, but the pre-aeration treatment had little effect on the water quality of the effluent.

## C. *Failure to Report Bypass Incidents*

109. At no time during this seven-week period of bypass incidents did defendant notify (either orally or in writing) DOH, the public or any other entity as required by its permit and the mandatory procedures binding upon it. Thus, DOH was not given the opportunity to implement measures to mitigate the bypasses, to notify the public, or to eliminate the public health dangers, if any existed.

110. Plant employees have testified that there were several reasons for their failure to report the bypasses to the DOH. First, they believed that they were not required to report the bypasses because the interim effluent limitations had not been exceeded. Moreover, Norman Ching, the plant superintendent at the time of the bypasses, testified that he considered the maintenance done on clarifier # 1 to be essential. In addition, Ching also testified that he believed that the city had adequately notified the DOH by its letter dated July 27, 1989, which warned of possible hydraulic overloading and reduced efficiency.

111. Management level plant employees, including the plant superintendent, either were unaware of, or disregarded, the bypass reporting provisions of the permit. They did not believe that they were required to report

the bypasses to DOH. Lower level plant employees, some of whom expressed concern over the bypasses to their supervisors, were told that the plant had "permission" to bypass sewage (by wastewater processing superintendent Allen Perry ("Perry") or assistant plant superintendent Nicanor Musico ("Musico")). They were also told by their supervisors that no reporting of the bypasses was necessary. Nonetheless, lower level plant employees did express concern about the appropriateness and legality of the bypasses. Plant employees never received any training, or written, or verbal instruction on how to minimize or report bypasses.

112. Ching was on vacation when the bypasses commenced on October 3, 1989; assistant plant superintendent Musico was in charge of the plant at that time. Ching returned to work sometime in late October 1989.

113. Plant employees testified that they believed that it was impossible to have bypasses at the Honouliuli plant. Superintendent Ching, for example, testified that in October and November 1989, he understood that a bypass involved the diversion of influent sewage around the entire processing plant to be discharged directly through the outfall. He testified that he believed it was "impossible" to have bypasses at the plant because the plant did not have a bypass pipe. Similarly, Musico testified that he believed that what happened at the bypass weir was an *overflow,* which apparently involves the spilling over of sewage from a tank or channel and was not required to be reported as a bypass to the DOH.

114. As discussed above, the city's internal reporting procedures require the immediate reporting of any "emergency or anticipated discharge of raw or partially treated sewage (overflows/bypasses)." Thus, the distinction between bypasses and overflows was irrelevant for reporting purposes, at least within the WWT & D. Since the purpose of the internal reporting requirements was to ensure adequate notification to the DOH and the public, it is logical to conclude that the city intended the plant to report any overflow or bypass, and that the appropriate city offi-

cial would then inform the DOH and the public. The notification letter that the city sent to the DOH regarding the maintenance of primary clarifier # 1 does not mention the possibility of either bypasses or overflows. Yet, as Musico testified, the city was aware that overflows might occur and that the interim effluent limitations might be exceeded.

115. The trial testimony of the plant supervisors and employees and the evidence before the court demonstrates that these individuals were *well aware* of the term "bypass" and of its meaning. Plant employees were familiar with, and regularly used, the term "bypass" as a reference to what Musico called an overflow. In the internal wastewater bypass report submitted by Ching on July 19, 1989, for example, he referred to "possible in-plant bypass of partially treated wastewater."

116. Other city employees in the Wastewater Management division ("WWMD") were well aware that the NPDES permit defined a bypass as an intentional diversion around *any* portion of the treatment process. Moreover, they were not aware that the plant employees believed that the flows over the bypass weir were overflows, not bypasses.

117. The city's Water Quality section, which is part of the planning branch of the WWMD, acted as the "keepers" of the Honouliuli NPDES permit. The Water Quality section is responsible for administering the city's NPDES permits. David Nagamine, an engineer in the Water Quality section, testified that the practice of his section is to give copies of the city's NPDES permits to the Wastewater Treatment and Disposal branch ("WWT & D"), which is responsible for administering the treatment plants. The WWT & D was responsible for informing the individual plants of the requirements under their NPDES permits. There was some testimony that the main plant at Sand Island may have received copies of the NPDES permit for the plants in the area.

118. The city failed to keep a copy of the Honouliuli NPDES permit at the plant itself. Ching and Musico were only vaguely familiar with the bypass provisions in the permit and never asked to see the permit. They were apparently operating under the mistaken as-

sumption that the terms of the 1985 consent order had superseded *all* the provisions contained in the NPDES permit. In this case, the city never sufficiently coordinated the keepers of the permit with the operators of the Honouliuli plant.

### D. *DOH Investigation*

119. No city employee ever reported the bypasses to DOH or EPA. In fact, these unreported bypass incidents were not discovered by DOH, EPA, or the public until an anonymous tip by a plant employee on or about November 17, 1989, to a member of plaintiff Sierra Club, who in turn immediately reported the incidents to DOH enforcement officer Ciesla. Ciesla, a DOH (and EPA) employee with extensive experience monitoring compliance of sewage plants, was responsible for investigating noncompliance allegations and for making recommendations to DOH about appropriate enforcement action.

120. City employees cooperated in the DOH investigation of the bypass incidents by speaking with Ciesla and preparing a chart documenting the amount of sewage bypassed per day.

121. DOH later initiated a limited administrative enforcement action against the city for failure to sample effluent on 22 weekend days during the October–November 1989 period, since the city could not prove that the interim effluent limitations were met on those days. DOH issued a Notice and Finding of Violation and levied $449,000 in fines against the city, However, the city has yet to pay any fines to DOH as a result of this administrative action.

### E. *Bypass and Reporting Violations*

122. During these bypass incidents (and at all times from July 1, 1988 to present), the effluent limitations in the plant's permit are pegged to secondary treatment of sewage (including the 85% removal rate).

123. In its July 3, 1991 order, the court held that the city violated the permit and the Clean Water Act on 52 separate dates by bypassing sewage in contravention of the permit provision. Because the city failed to

meet the required secondary treatment levels during the bypasses, the bypasses were prohibited regardless of whether the repair of clarifier # 1 was essential. Even if the city had been bound only by the interim effluent limitations in the consent order, it would still be liable for the bypasses because it failed to establish that the maintenance was essential. There appears to be no reason that it was necessary to begin the maintenance in October, when flows are predictably seasonally high.

124. The court further held in its July 3, 1991 order that the city violated the permit on the same 52 separate dates by failing to report immediately the bypasses to DOH, the public or other required governmental entities, and by failing to file the mandatory written reports within five days thereafter. The fact that plant employees may have believed they were not required to report the bypasses because the discharges remained within the interim effluent limitations does not relieve the city of its statutory obligation, although it may be relevant to determining whether the city acted in good faith.

125. In addition, the city had anticipated possible bypasses during the repairs of primary clarifier # 1, but failed to adequately notify DOH in advance of the bypass. This failure to give prior notice also violated the terms of the NPDES permit.

126. Both the city's and plaintiffs' experts agree that, if the city had in place during the bypass episodes the recently completed 13 mgd plant expansion, the bypasses would not have occurred at the flow levels then experienced. In addition, the city has made several improvements in the bypass weir itself, which, if they had been done before October 1989, could have prevented the bypasses. In January 1990, the city installed a 24 inch high marine wood weir between the influent and effluent channels. (The bypass weir in 1989 was eight inches high.) This temporary measure was approved by DOH as able to withstand peak flows of up to 40 mgd for short periods of time. Then in January 1991, a concrete wall was built to replace the wood weir.

127. No bypasses have occurred at the Honouliuli plant since November 1989.

128. Plaintiffs have demonstrated that, at the time their complaint was filed, there was a likelihood of recurrent bypass violations at the plant and, accordingly, plaintiffs have satisfied the *Gwaltney* doctrine.

## III. SECONDARY TREATMENT VIOLATIONS

129. As discussed above in Section I.G.2, the city has operated the Honouliuli plant as if the interim effluent limitations established in the 1985 consent order have been in effect even after July 1, 1988. The court has ruled, however, that neither the EPA nor the DOH has the authority to extend the compliance deadline for secondary treatment beyond the statutory deadline of July 1, 1988. July 3, 1991 Order at 21–23. The court also held that the pendency of a 301(h) waiver application does not shield the defendants from liability for violations of the secondary treatment requirement. *Id.* at 22. Accordingly, by order dated May 8, 1992, the court granted summary judgment in favor of plaintiffs, finding that the city had been in continuous daily violation of the secondary treatment effluent limitations.

130. The Honouliuli plant has exceeded all of the secondary treatment effluent limitations on the discharge of BOD and SS contained in its permit every day from July 1, 1988 to December 31, 1992. These limitations are: the 30 day average and the 7 day average for the mass emission rate and concentration, and the percent removal.

## IV. FACTORS RELATED TO ASSESSMENT OF PENALTIES

### A. *Seriousness of Violations*

131. In evaluating the seriousness of the city's bypass and secondary treatment violations, the court looks to several factors, including, but not limited to: (1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment. (*See* EPA, "Clean Water Act Penalty Policy," Feb. 11, 1985, at 3–5.)

#### 1. *Number of Violations*

132. The number of violations of the Clean Water Act in these cases is significantly high. The city has committed 104 bypass and reporting violations, and daily secondary treatment violations on 1645 days from July 1, 1988 to December 31, 1992.

#### 2. *Duration*

133. Both the bypass and secondary treatment violations are of long duration. The bypass and reporting violations continued on a daily basis for six weeks in October and November 1989. Moreover, there has been four-and-a-half years of continuous secondary treatment violations, commencing on July 1, 1988 and continuing to the present day.

#### 3. *Significance*

134. The bypass and reporting violations are significant violations both in terms of the degree of exceedance of the permit limitations and the importance of the permit provision violated.

135. The mass emission rate limitation for BOD and SS is 2840 kg/day (monthly average). Comparing these permit limitations to the actual emissions during October 3 through November 28, 1989, it is evident to the court that the bypassed effluent made a significant contribution to the plant's overall exceedance of its permit limitations.

136. Ciesla testified that he could not recall any series of bypass episodes in Hawaii that ever exceeded the 106 million gallons bypassed in this case.

137. The prohibition against bypass is an important provision of the NPDES permit because a bypass involves the discharge of sewage that has skipped a unit of treatment. Fortunately for the city, the effluent never exceeded the interim limitations established in the 1985 consent order. Since the interim limitations do not apply after July 1, 1988, however, the city has been in continuing violation of its NPDES permit effluent limitations.

138. The city did not follow the detailed provisions of its own directive and standard operating procedures. Although an appropriate internal wastewater bypass report was submitted prior to the anticipated bypass incidents, the city failed to inform DOH either before or during the incidents.

139. The failure to report is even more significant than the bypasses themselves because without notice, DOH was deprived of the critical opportunity to investigate in a timely manner, direct the city to take mitigative measures, warn the public through the media, post signs, or require additional monitoring. The city had a duty to inform DOH of the bypasses even if it believed in good faith that no harm to public health or the environment would have resulted. Testimony revealed that plant managers felt that DOH had no role to play in the internal operations of the plant. The court finds this attitude troubling, to say the least, because neither the city nor the plant managers are in sole control of the operation of the plant. The reporting requirements are designed to afford DOH an opportunity to provide a "check" on the operations of the plant. Even if DOH would have determined that no protective measures were needed, it still should have been informed.

140. Similarly, but to a much larger degree, the city's secondary treatment violations are significant in terms of the degree of exceedance of the permit limitations and the importance of the provision violated.

141. The city's daily secondary treatment violations resulted in discharges significantly above the NPDES permit levels for BOD and SS.

142. The secondary treatment-based effluent limitations in the city's permit are a fundamental requirement of the permit. That the city believed the interim limitations had superseded the NPDES permit limitations does not detract from the significance of the violation, although it may be relevant to whether the city acted in good faith.

#### 4. *Harm to Environment and Public Health*

143. The Honouliuli effluent consists of 23–25 mgd of primary-level treated sewage. In 1992, the Honouliuli plant discharged ap-

proximately 11,000 kg (or 24,200 lbs) of BOD every day and 4,500 kg (9,900 lbs.) of SS. The NPDES permit limit is 2,840 kg/day of BOD and 2,840 kg/day of SS.

144. The plant currently removes approximately 40–50% of the BOD and 70–80% of the SS from the influent; it is operating effectively as a primary treatment system.

145. If the plant provided secondary level treatment, the removal rates would probably be approximately 90–95% for both BOD and SS.

146. Sewage consists of both organic and inorganic compounds and particles of various sizes. Sewage consists of sediment, nutrients, (e.g., nitrogen, phosphorous, nitrites and nitrates), freshwater, and organic materials known as "biochemical oxygen demand" (which reduce the oxygen available to the ambient ocean environment).

147. The effluent of the Honouliuli plant consists primarily of domestic sewage, which can contain a variety of pathogenic organisms, including both bacteria and viruses. Sewage particles (both SS and organic materials) can provide a transport vehicle for pathogens.

148. The Honouliuli plant does not disinfect, and has never disinfected, its effluent. If the plant were to disinfected its effluent, a high percentage of the pathogens could be killed; however, the plant is not currently required by its permit or by the DOH to disinfect its effluent. The plant is equipped with chlorination equipment, but the DOH has never required the plant to disinfect its effluent because the state water quality standards have not been violated in the receiving waters. Of note, however, is the fact that the plant is not presently equipped with dechlorination facilities to remove chlorine from the disinfected effluent before it is discharged, in the event chlorination were required or ordered.

149. The city currently conducts comprehensive monitoring of the water quality at the plant and in the receiving waters, of the biological community in the area of the outfall, of the sediment in the vicinity of the sewage discharge, and of the outfall/diffuser itself. Relevant data from this monitoring program is discussed below in connection with the impact of the Honouliuli discharge.

a. *Fate of the effluent sewage*

150. Plaintiffs have presented testimony that the Honouliuli outfall and diffuser system is currently operating outside of its design parameters. Dr. Scott Jenkins ("Jenkins"), plaintiffs' expert in physical oceanography, specializing in coastal processes and hydraulics, has criticized the plant as being designed for secondarily treated effluent at higher flows. Because the plant discharges primarily treated sewage at lower rates of flow, he concluded that there must not be sufficient pressure to diffuse the sewage to achieve the dilution of the effluent predicted by the city's experts.

151. Although the plant may not be operating at optimal design levels, there is no evidence before the court that it is not operating efficiently and effectively. The design range of the outfall is not as narrow as Jenkins posits. The Barbers Point outfall design report states, for example, that "[t]he optimal outfall design for the Barbers Point Outfall System is practically identical whether considering primary or secondary effluent." And the design report goes on to explain that an "additional 600 feet of diffuser has been included for the flexibility of using the ocean outfall for either secondary or primary effluent." The court is not in the business of second guessing the proper pipe size for a deep ocean outfall. The court recognizes that the construction of the outfall was constrained by costs and feasibility as well as optimal design features, and does not find that the current outfall was the result of an ill-informed decision by the city. The court finds that the evidence shows that the removal rates for both SS and BOD are above the 30% rate that defines primary treatment. Moreover, surveillance of the outfall and diffuser pipes shows no malfunction in the diffuser ports or other operational problems.

152. The sewage discharged through the outfall contains fresh water, which is lighter than sea water; therefore, the sewage plume tends to rise as it leaves the outfall. The sewage plume usually remains submerged

and spreads horizontally when it reaches water that is equal to it in density. At other times, however, the plume enters the top mixed layer and surfaces. Dr. Edward Noda ("Noda"), the city's expert in coastal engineering and hydrodynamics, has estimated from available data that the sewage plume from the Honouliuli outfall surfaces approximately 25% of the time over a year. There are, however, well-established seasonal variations in the depth of the mixed layer, so that surfacing occurs about 15–25% in the summer, 30–40% in the spring, and 50% or more in the winter (it has gone as high as 98% in November).

153. Noda presented a computer generated model illustrating the fate of the sewage plume as it leaves the diffuser. The Noda model is based on water density, wind and current data taken near the Honouliuli outfall. Based on this data, Noda calculated the initial dilution, in the worst case scenario, to be 118:1 for a submerged plume and 461:1 for a surfacing plume. These figures may be not reflect the fact that episodes of less dilution could occur, because the Noda model predicts averages over time rather than specific instances. The model does give an overall picture of the fate of the sewage plume, however.

154. The Noda model predicts that effluent from the Honouliuli outfall will surface and reach the shoreline along Mamala Bay approximately .1% of the time over a year. The effluent that reached the shore would be diluted at minimum approximately 1700:1. Not surprisingly, plaintiffs' experts suggest that Noda's model underestimates the frequency of surfacing and the extent of shoreward transport. Jenkins and Dr. Douglas Segar, plaintiffs' oceanography expert specializing in the cross disciplinary investigation of marine pollution, offered credible testimony about wind and current effects that suggests the net direction of transport during both Kona and tradewind conditions is northwest toward shore rather than off to the southwest as Noda had predicted. Dr. Segar also testified that actual current data shows that the current speed was slower than Noda assumed, which would lead to less dilution when the plume reached the shore-line. Their testimony is supported by current measurements taken near the Honouliuli outfall, as reported in the city's 1983 reapplication for a 301(h) waiver.

155. Accepting that the Noda model may underestimate the frequency of the plume reaching shore, and overestimate dilution, there is still no evidence that counters Noda's conclusion that there has been no actual harm to the environment or to public health. Plaintiffs have made an arguable case for the potential risks of harm, and perhaps the need for further study on the impact of sewage in Mamala Bay, but have not shown that the city's violations of the Clean Water Act have contributed to any adverse impact on the environment or public health.

b. *Impact on environment*

156. There appear to have been some changes in the marine community since the Honouliuli outfall was built and has been operational. As Dr. Robert Richmond, plaintiffs' expert on coral reef and marine biology, testified, studies have shown that the populations of certain species of indicator fish known to be sensitive to environmental changes have decreased since the outfall has been operational. In addition, Dr. Steven Dollar, the city's expert in oceanography, specializing in biogeochemistry, found a slight change in the metabolism of the benthic (bottom dwelling) community due to sedimentation from the sewage discharge, but concluded that sedimentation has an insignificant overall impact. Dr. Edward Laws, the city's expert in phytoplankton, explained that there were elevated levels of algae in Mamala Bay, and attributed most of the elevation to discharges from Pearl Harbor, but admitted that the plant discharges could also have contributed to the elevation.

157. While it is possible that the Honouliuli discharge may have contributed to these environmental changes, it is also possible that other factors are wholly responsible for the changes. The overriding theme of the often conflicting expert testimony is that there is insufficient data on the impact of sewage on the marine community to form any conclusions. The city's experts testified

that there was no adverse effect from sewage discharged from the Honouliuli outfall on coral reefs, benthic communities, fish populations, phyto- and zooplankton. But plaintiffs' experts repeatedly noted that the lack of evidence of adverse impact does not mean that there is no adverse impact to those communities. Before any definitive answer is possible, more comprehensive studies must be performed. This is not to suggest that the city has been lax in studying the impact of sewage on the environment, only that more evidence is needed to fully evaluate the situation. The court can conclude, however, that there has been little measurable effect from the discharge on the environment in Mamala Bay in the studies done to date.

### c. *Public health risks*

158. The expert testimony regarding potential health risks is similar to the testimony about environmental impact. Plaintiffs' experts offered much speculation about the possibilities of harm, but presented no direct evidence of actual harm. While it is possible that pathogens in sewage may cause diseases that do not get reported, such as gastroenteritis, there have been no documented outbreaks of disease related to sewage contamination from the Honouliuli outfall. There have been, however, no epidemiological studies of the Honouliuli area.

159. At least one study has shown some evidence that fecal matter from the Honouliuli outfall *may* be reaching the shoreline. Dr. Roger Fujioka found elevated levels of enterococcus and Clostridium perfingens, two bacteria associated with human waste, at shoreline stations ranging from 8% to 33% of the year. His results, however, are not conclusive as to the source of the contamination.

160. The city's expert in water quality ecology, Kris Lindstrom, testified that data from the city's water quality sampling at the shore and near shore indicates that contamination at the shoreline, when it occurs, seems to come more from land runoff and discharges into Pearl Harbor than from the outfall.

### B. *Economic Benefit*

161. Estimates of the cost of building a 25 mgd secondary treatment plant range from $55–66 million according to Dr. Peter Melnyk (city's expert), to $37 million according to Dr. Bruce Bell (plaintiffs' expert). The disparity in the expert estimates stems from different types of secondary treatment technology chosen, and conversion factors used for calculating present day costs of equipment.

162. The court will use the most conservative estimate, $37 million, in calculating the economic benefit to the city from its noncompliance with the secondary treatment requirement.

163. There are two components to the calculation of economic benefit: (1) the benefit that the city received from delayed capital spending (i.e., money saved by delay in issuing and making payments on general obligation bonds to finance the construction of the required pollution control equipment); and (2) the operating and maintenance ("O & M") expenses for the pollution control equipment that the city avoided operating during the period compliance was delayed.

164. The economic benefit can be quantified by comparing the present value of the costs of complying on time with the costs of complying late. If the costs of complying late are less than the costs of complying as required by law, the city has enjoyed a positive economic benefit.

165. An integral part of an economic benefit calculation is a "present value analysis" of compliance costs based on dates, rates and amounts. Present value is a common economic term that refers to a stream of future cash flows expressed as a single current dollar amount. The purpose of the analysis is to compare the present dollar value of the city's delayed compliance costs with the present dollar value of the city's costs had it completed and begun operating necessary pollution control equipment in a timely manner.

166. According to the testimony of Dr. Michael Kavanaugh ("Kavanaugh"), plaintiffs' economist, the city received an economic benefit of at least $39.35 million by failing to have an operational secondary treatment plant at Honouliuli beginning on July 1, 1988. This sum is composed of $23.3 million in

delayed capital spending and $16.05 million in avoided operating and maintenance expenditures, all expressed in January 1993 dollars. Kavanaugh's calculations of economic benefit are based upon the capital construction cost and annual O & M cost estimates of plaintiffs' expert, Dr. Bruce Bell. Kavanaugh estimates an economic benefit of up to $58.85 million using Dr. Peter Melnyk's capital cost estimates.

167. According to Dr. Lewis Freitas ("Freitas"), the city's economist, the economic benefit enjoyed by the city was approximately $5.6 million. This figure includes a $22.4 million benefit in avoided operating and maintenance expenditures, plus a $16.8 million *loss* incurred by delaying construction. Freitas used different conversion factors than Kavanaugh to calculate the present value costs; he chose a different opportunity cost (interest rate) and a different rate of change in cost of pollution control equipment ("inflation" rate). The most significant difference, however, was that Freitas assumed that the city would have received a federal subsidy of approximately $45.75 million over four years for the construction of secondary treatment facilities, under 33 U.S.C. § 1285. Freitas reasoned that by delaying construction past the expiration of the subsidy program, the city would now have to spend more of its own funds to build the upgrade, and consequently would be losing money.

168. It would be illogical, however, to reward the city for losing a federal subsidy for the construction of the upgrade that would have saved money for the sewer users and taxpayers of Honolulu. Moreover, the State of Hawaii had already received its allotted $19 million per year under the subsidy program, and used the funds for other projects. Even if the Honouliuli project had been given top priority for the use of the subsidy funds, the state would have had to spend an equivalent amount of its own money to fund those other projects. Therefore, the court will not adopt the city's assumption that it enjoyed no benefit because it lost its opportunity to obtain federal subsidies.

169. As for the bypasses, plaintiffs take the position that because the recent 13 mgd expansion would have prevented the bypas-

ses, the city should have completed the expansion by October 1989 to avoid noncompliance. According to Kavanaugh, the city enjoyed a benefit from the delay of approximately $2.5 million in deferred capital costs and avoided O & M expenses.

170. The city did take remedial measures after the bypass incidents of October and November 1989. The city installed a higher wooden weir in January 1990, and replaced it with a concrete wall in January 1991. The 1990 improvement alone would have prevented the bypass incidents. The city did enjoy a benefit from the delay in installation, but there has been no testimony about the costs of the weir. Since the improved weir was built only a few months after the bypass incidents, the benefit from deferred costs is probably insignificant. The court does not adopt plaintiffs' calculation of a benefit of $2.5 million because the expansion was not necessary to avoid the bypasses.

## C. History of Violations

### 1. Bypasses

171. There has been testimony that the city may have had a history of bypasses at the Honouliuli plant. According to plant employees, bypasses were predictable at certain flow levels, even with two clarifiers in service. With one clarifier in operation, the plant could only handle flows of 25.5 mgd before sewage would spill over the weir located between the influent and the effluent channel.

172. Ciesla testified that plant employees told him there had been bypasses at the plant prior to October 1989 when the rains were heavy, even when both clarifiers were in operation. Earl Ng, an engineer with the Water Quality section, also testified that he recalled mention of prior bypasses occurring when it rained. There is, however, no *direct* evidence, testimonial or documentary, in the record that prior bypasses did in fact occur at Honouliuli.

### 2. Noncompliance with Secondary Treatment

173. The city has been in technical but continuing violation of the secondary treat-

ment requirement since the compliance deadline of July 1, 1988. The continuous nature of the violation is relevant to the seriousness of the noncompliance, but does not reflect a history of prior violations. The court notes, however, that the city could not have been in violation of this particular requirement before the compliance deadline, as DOH had permitted the plant to discharge primarily treated effluent that met the interim limitations set in the 1985 consent order. Therefore, the court finds that this factor is not applicable to the determination of an appropriate penalty for the secondary treatment violation.

### D. *Good Faith Compliance Efforts by City*

#### 1. *Bypasses*

174. The city made little effort prior to October 1989 to avoid the bypasses that occurred in October and November 1989. The city could have minimized or prevented the bypasses by: rescheduling the maintenance to a period of low projected flows into the plant; raising the height of the bypass weir; adding a new weir; or backing up wastewater, to a limited extent, in the influent channel into the pre-aeration tanks (after installing a backflow preventer to protect the piping system). The city clearly had foreknowledge of the propensity of the plant to bypass at certain flows. Certain mitigation measures were quite feasible and, therefore, should have been implemented before the bypass incidents occurred. Indeed, the city did take steps to prevent future bypasses beginning in January 1990, after it had been notified that plaintiffs intended to bring suit.

175. The belief of city employees that the plant was required to meet interim effluent limitations was evidence of good faith, as discussed below. Therefore, the noncompliance with the bypass provisions is mitigated to an extent by the belief that the bypasses were permitted, and that no reporting was required, because the effluent limitations were not exceeded. *See* Permit, Section II. B.10.b. However, there is little evidence that the maintenance on primary clarifier # 1 was "essential ... to assure efficient operation," which is the second element required in the permit to excuse the bypasses and

exempt the city from the reporting requirement.

176. The city had anticipated that the bypasses would occur, yet it did not follow the detailed reporting provisions of its own directive and standard operating procedures, or of the permit itself. The city failed to inform DOH about the bypasses either before or during the incidents.

177. The convenient distinction between overflows and bypasses made by the management of the plant appears to the court to be a self-serving, after-the-fact justification for their failure to report the bypasses. The trial testimony of city employees disavowing knowledge of the bypasses is incredible and disingenuous, which reflects a lack of statutorily-mandated effort on the part of the city to comply with the requirements of its NPDES permit.

#### 2. *Secondary Treatment*

178. The court held in its order dated July 3, 1991, that the July 1, 1988 compliance deadline could not be extended administratively. *See* 33 U.S.C. § 1311(i)(1). The court then found that the city had been in continuous violation of the secondary treatment requirement since July 1, 1988. May 8, 1992 Order.

179. Prior to those orders, the city had operated the Honouliuli plant under the assumption that the only applicable effluent limitations for the plant were the interim limitations established in the 1985 consent order. The plant has consistently complied with these interim limitations. Since the consent order established interim limitations as well as a construction schedule that would be triggered upon denial of the city's 301(h) waiver, it was reasonable for the city to infer that the interim limitations would be in effect until the final determination of its 301(h) application.

180. On or about June 14, 1990, DOH issued a letter in which it purports to extend, for an indefinite future period, the terms and conditions of the permit. DOH did not change any of the secondary treatment effluent limitations, or any other conditions, in the permit. However, on October 4, 1991,

the DOH stated to the city that "[t]he NPDES permit dated July 1, 1985 and administratively extended on June 30, 1990, remains in effect except for the effluent limitations relating to BOD and suspended solids which have been superseded by the current consent order dated December 15, 1982." The interim effluent limitations were set at maximum concentrations of 200 mg/1 BOD and 105 mg/1 SS; flow and mass emissions were not regulated.

181. The city has received conflicting information about the effluent limitations it was required to meet at the Honouliuli plant from the DOH and from this court. In addition to the above letter, when the DOH initiated its enforcement action for the 1989 bypasses, it cited as violations only those days when the city could not prove it had not exceeded the *interim* effluent limitations; DOH did not enforce the secondary limitations contained in the NPDES permit. It is understandable that the city may have been confused about its obligations to comply with the secondary treatment requirement.

182. Moreover, the court finds that it was also reasonable for the city to delay construction of a secondary treatment facility even after the court's ruling on liability. As even plaintiffs have acknowledged, it would be illogical to require the city to construct a secondary treatment facility at Honouliuli when it has a pending 301(h) application.

183. A separate question to consider is whether the city acted in good faith in pursuing its 301(h) waiver. Plaintiffs have argued that the city has unduly delayed the 301(h) process, causing the process to go on for 13 years. There is nothing improper about the city's decision to submit a reapplication in 1983, since the regulations had been amended to allow it. There was a 4 & ½ year delay between the city's reapplication in April 1983, and the tentative grant of the waiver in October 1988, but there is no evidence to suggest that the city has caused that delay by withholding information requested by EPA or otherwise "dragging its feet." There was a series of exchanges between EPA and DOH and the city, asking for or providing data addressing additional concerns, negoti-

ating the terms of the waiver, and other legitimate pursuits.

184. The only questionable action on the part of the city was its request for an evidentiary hearing after the EPA granted the waiver permit. The city filed a mandamus action to speed up the EPA hearing process, and later withdrew its request, only after this court ruled that it was liable for secondary treatment violations since July 1, 1988. There may be some argument that the city wanted to prolong the 301(h) process to delay the possibility of having to comply with secondary treatment requirements, but there is no evidence that the city acted in bad faith.

E. *Economic Impact*

185. The funds for the operation of the city's wastewater treatment facilities come from monthly sewer user fees. The sewer users of the City and County of Honolulu share the costs of all the facilities. Dr. Freitas and Dr. Kavanaugh agree that a $40 million penalty against the city, as sought by plaintiffs, would cost each single dwelling unit user approximately an additional $1.10 per month. Kavanaugh estimated that that would be a 4.61% increase in the sewer user rate. A penalty of $25 million would cause a 2.88% increase in the user rate. The imposition of a lesser penalty, therefore, would not be an undue burden on the city.

## CONCLUSIONS OF LAW

From the foregoing facts, the court concludes as follows:

■ 1. Any and all conclusions of law included in the foregoing findings of fact are adopted herein.

## I. JURISDICTION, VENUE, AND STANDING

2. These lawsuits are citizens' suits seeking to remedy violations of the Federal Water Pollution Control Act, also known as the Clean Water Act ("the Act"), 33 U.S.C. §§ 1251–1387.

3. The court has subject matter jurisdiction over the claims for relief set forth in the complaints pursuant to 33 U.S.C. § 1365(a) (citizen suits to enforce effluent standards or

limitations under the Clean Water Act), 28 U.S.C. § 1311 (actions arising under the laws of the United States), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory judgments in cases of actual controversy).

4. Venue is proper in this judicial district, pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the Clean Water Act violations, the Honouliuli plant, is located within this judicial district.

5. Plaintiffs have standing under the Clean Water Act, 33 U.S.C. § 1365(a) & (g), and Article III of the United States Constitution to bring the claims for relief set forth in the complaints herein. July 3, 1991 Order at 14.

■ 6. Defendant City and County of Honolulu qualifies as a "person" within the meaning of section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1).

7. None of the claims in these lawsuits, which extend back to July 1, 1988, are barred by the general federal five-year statute of limitations. 28 U.S.C. § 2462.

8. The city has no valid defenses to the court's jurisdiction over these lawsuits.

## II. THE CLEAN WATER ACT

9. The Clean Water Act was enacted by Congress in 1972 with the express objective of restoring and maintaining the chemical, physical, and biological integrity of the nation's waters. 33 U.S.C. § 1251(a).

10. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits discharge of all "pollutants" from a "point source" into navigable waters of the United States, unless the discharging party is in compliance with the various enumerated sections of the Act.

11. Section 502(6) of the Act, 33 U.S.C. § 1362(6), defines the term "pollutant" broadly to include sewage, sewage sludge, municipal waste, and biological materials.

12. A "point source" under the Act is "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

### A. NPDES Program

13. The primary enforcement mechanism of the Act is the National Pollution Discharge Elimination System ("NPDES"). Under NPDES, either EPA or an individual state (if, as in Hawaii, the state program has been approved by EPA) issues NPDES permits to individual dischargers. 33 U.S.C. § 1342.

14. Section 301(a), 33 U.S.C. § 1311, prohibits any discharges into navigable waters of the United States by any person (including a municipality) without a NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15. Each NPDES permit sets forth specific effluent limitations, conditions, and other standards, which then become binding legal obligations that must be met by the permittee. *Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480, 1483 (9th Cir.1987), *vacated on other grounds*, 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988), *judgment reinstated*, 853 F.2d 667 (9th Cir.1988) (hereinafter *"Union Oil"*) (*citing Environmental Protection Agency v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976)).

16. An "effluent limitation" is defined by the Act as "any restriction established by a State or the [EPA] Administrator of quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

17. Pursuant to authority conferred on it by the Act, EPA authorized the State of Hawaii to issue NPDES permits in Hawaii through the State Department of Health ("DOH").

18. The state's program for issuance of permits must comply in all respects with, and must prescribe no less stringent effluent limitations than, those set forth in the Act itself. 33 U.S.C. § 1342(b).

19. The Act requires DOH to prescribe effluent limitation conditions that meet the discharge requirements set forth in the Act. 33 U.S.C. § 1342.

20. Each NPDES permittee must install, use, and maintain monitoring equipment to sample its effluent. 33 U.S.C. § 1318.

21. Section 308 of the Act, 33 U.S.C. § 1318, requires each NPDES permittee to monitor its discharges and report periodically on its permit compliance to EPA and to the state agency that issued the permit. These self-monitoring reports, known as discharge monitoring reports ("DMRs"), are public documents that must be submitted at regular intervals specified in the permit. 40 C.F.R. § 122.41(1)(4). In essence, "a discharger must report its own permit violations should they occur." *SPIRG v. Fritzsche, Dodge & Olcott, Inc.,* 579 F.Supp. 1528, 1531 (D.N.J.1984), *aff'd,* 759 F.2d 1131 (3d Cir. 1985).

### B. *301(h) Waiver Process*

22. In 1977, Congress amended the Act to include Section 301(h), 33 U.S.C. § 1311(h), which provides, in certain extraordinary circumstances, for a "waiver" from secondary treatment for municipalities discharging from deep ocean outfalls.

23. EPA has promulgated regulations to implement and process applications for Section 301(h) waivers. 40 C.F.R. §§ 125.56–125.67.

24. The Act puts severe constraints on EPA's authority to issue waiver permits under Section 301(h). EPA must make a series of factual findings dictated by the Act before a waiver can be issued. 33 U.S.C. §§ 1311(h)(1)–(h)(9).

25. Even after the EPA Administrator decides to grant a waiver permit, if an appeal is initiated, the permit does not become effective until a detailed appeal and hearing process within EPA is successfully completed. 40 C.F.R. § 124.15(b)(2); 40 C.F.R. §§ 124.-71–124.91.

26. Because of the appeals by both plaintiffs and the city of the EPA decision to issue a 301(h) waiver to the plant, the waiver for the Honouliuli plant never became effective. 40 C.F.R. § 124.15(b)(2).

27. The filing of a request by a permittee for a permit modification (which includes a 301(h) waiver application), revocation, reissuance, or termination, or notification of planned changes or anticipated noncompliance does not stay any permit condition. 40 C.F.R. § 122.41(f).

### C. *Liability for Violations*

28. Violations of the effluent limitations and the bypass provisions in the Honouliuli NPDES permit are violations of the Act. Permit, Section II.B.1. *See also Atlantic States Legal Foundation v. Universal Tool & Stamping Co., Inc.,* 786 F.Supp. 743, 746 (N.D.Ind.1992) ("Where as permittee is in violation of an NPDES discharge limitation, it is also 'in violation of . . . an effluent standard or limitation under [the Act],' 33 U.S.C. § 1365(a).").

29. The Clean Water Act imposes strict liability for NPDES violations and does not excuse "de minimis" or "rare" violations. *Union Oil,* 813 F.2d at 1491. Courts throughout the country have held that NPDES compliance is a matter of strict liability, and a defendant's intent and good faith are irrelevant to the liability issue. *See, e.g., Stoddard v. Western Carolina Regional Sewer Authority,* 784 F.2d 1200, 1208 (4th Cir. 1986); *Atlantic States Legal Foundation v. Tyson Foods,* 897 F.2d 1128, 1142 (11th Cir. 1990).

30. The fact that a violator is "without fault" in committing violations of the Clean Water Act does not absolve the violator from penalties, although it may mitigate the amount of the penalties assessed. *See United States v. Ohio Edison,* 725 F.Supp. 928, 934 (N.D.Ohio 1989) ("Even assuming that defendant is without fault in this matter, *the statute does not require fault to support a penalty.* Issues of fault and intent are relevant only on the question of the *amount* of the penalty imposed.") (emphasis added); *United States v. Boccanfuso,* 695 F.Supp. 693, 700 (D.Conn.1988) (assessing civil penalty to defendant landowner even though court found he had reasonably relied on government misconduct and exercised diligent efforts to comply with law).

### III. BYPASSES

31. In its July 3, 1991 order, the court held that the city had committed 104 bypassing and nonreporting violations of its permit and thus the Clean Water Act.

### IV. SECONDARY TREATMENT

32. In 1972, Congress amended the Clean Water Act to require all municipalities with sewage plants to achieve effluent limitations based on secondary treatment by July 1, 1977. 33 U.S.C. § 1311(i)(1).

33. Congress later extended the initial deadline for compliance with secondary treatment to July 1, 1988. Under the Act, if a POTW needed an permit extension because of ongoing construction, it could apply for one under Section 301(i), but this extension could last no later than July 1, 1988. Congress has not enacted any further extensions of this statutory deadline.

. 34. The Act now mandates that all POTWs meet "secondary treatment" effluent limitations by July 1, 1988. 33 U.S.C. § 1311(i)(1).

35. After July 1, 1988, all treatment plants which have not yet been officially granted a section 301(h) waiver permit must be in compliance at the secondary treatment level after the July 1, 1988 deadline has passed. The pendency of a section 301(h) waiver and other permit modification applications does not excuse noncompliance with the Act in the interim. *See* July 3, 1991 Order at 22 (*citing United States v. Metropolitan District Commission*, 23 E.P.C. 1350, 1357 (D.Mass.1985); *Sierra Club v. City and County of Honolulu*, Civ. No. 90–00219 ACK, December 31, 1990 Order).

■ 36. Even if the city eventually does obtain an effective 301(h) waiver permit for the Honouliuli plant, this permit will not retroactively "cure" previous violations of the Act. *See* August 27, 1992 Order at 9–10 (citing *Menzel v. County Utilities Corp.*, 712 F.2d 91 (4th Cir.1983); *Connecticut Fund for the Environment, Inc. v. UpJohn Co.*, 660 F.Supp. 1397, 1413 (D.Conn.1987); *SPIRG v. Monsanto Co.*, 600 F.Supp. 1479 (D.N.J. 1985); *United States v. Metropolitan District Commission*, 16 Envtl.L.Rep. (E.L.I.) 20,621, 1985 WL 9071 (D.Mass.1985)).

■ 37. Neither EPA nor its state agent, DOH, has authority to extend secondary treatment deadlines or grant permits to discharge at less than secondary levels beyond July 1, 1988. Accordingly, the provisions in the 1985 consent order between the city and DOH purportedly lowering the effluent limitations for the plant are of no effect after the statutory municipal compliance deadline of July 1, 1988.

38. As the court held in its May 8, 1992 order, the city has been in continuous daily violation of the secondary treatment effluent limitations in its NPDES permit since July 1, 1988.

■ 39. Plaintiffs have calculated that the plant has accumulated a total of 11,382 separate violations of the secondary treatment effluent limitations in its permit from July 1, 1988 to December 31, 1992. Plaintiff's calculation treats an exceedance of each effluent limitation as a separate violation and assumes that the violation of a 30 day average counts as a violation for every day of that month (i.e., 30 violations in a month with 30 days), and the violation of a seven day average counts as 7 violations. There were a total of 1,645 days in this period.

40. The court does not find that plaintiff's methodology is the most analytically sound approach. The Ninth Circuit has not addressed the method for counting violations of the Clean Water Act, but other circuits can provide some guidance. In *Atlantic States Legal Foundation v. Tyson Foods*, 897 F.2d 1128, 1138–40 (11th Cir.1990) ("*Tyson*"), the court held that each distinct violation is subject to a separate daily penalty when calculating the maximum penalty. Because 33 U.S.C. § 1319(d) provides for a maximum penalty of $25,000 *per day* for *each violation*, the court concluded that each express limitation that is violated on a single day counts as one violation. However, the *Tyson* court was considering violations of discharge limitations for several *different pollutants* on the same day. The court did not specifically address different effluent limitations for a single pollutant.

41. Moreover, the *Tyson* court held that exceeding the daily average limitation (calculated by averaging daily samples over one month, like the 30–day average in Honouliuli's permit) subjects the violator to a $25,000 penalty for each day of that month. In other words, violation of the daily average counts as 30 violations in a month with 30 days. *See also Atlantic States Legal Foundation v. Universal Tool & Stamping Co., Inc.,* 786 F.Supp. 743 (N.D.Ind.1992).

42. The court in *Tyson* further held, however, that if a polluter exceeds both the daily average and a daily maximum limitation for the same pollutant on a given day, only one violation is counted. The court reasoned that it would be unfair to fine a violator twice for what could be a single act. *Id.* at 1140.

43. The reasoning about duplicative penalties in *Tyson* suggests that the court should eliminate the penalties for exceeding the 7 day averages, since those are duplicative of the 30 day averages. Plaintiffs' method penalizes the city for exceeding both 7 day and 30 day averages on a given day. The *Tyson* approach, in contrast, makes the city liable for exceeding the limitations on mass emissions, concentration, and percent removal for both BOD and SS on each day it discharged effluent that had not been given secondary treatment. This approach would give the city a total of 9,870 violations.[4]

## V. CIVIL PENALTIES

### A. *The Purpose of Assessing Civil Penalties*

44. The purpose of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251.

45. Congress prescribed both civil and criminal penalties for violations of the Clean Water Act. The legislative purposes of the civil penalty provision of the Clean Water Act, 33 U.S.C. § 1319(d), are restitution, deterrence, and retribution. *See Tull v. United States,* 481 U.S. 412, 422–23, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987).

46. To achieve the goal of deterrence, a penalty must be high enough so that the discharger cannot "write it off" as an acceptable environmental trade-off for doing business. *See PIRG v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158, 1166 (D.N.J. 1989) ("A civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business.").

47. The court finds that a civil penalty is appropriate to protect the environment and enhance enforcement of the Act in Hawaii. The city must be encouraged to be vigilant in studying and monitoring the impact of sewage discharge on the environment and public health.

48. Civil penalties are mandatory once Clean Water Act violations are found, although the amount to be assessed is wholly within the discretion of the court. *See Atlantic States Legal Foundation v. Tyson Foods, Inc.,* 897 F.2d 1128, 1142 (11th Cir. 1990); *Stoddard v. Western Carolina Regional Sewer Authority,* 784 F.2d 1200, 1208 (4th Cir.1986).

### B. *The Methodology For Setting Civil Penalties*

49. Congress has established a clear statutory scheme for courts to determine appropriate penalties for violations of the Clean Water Act. Section 309(d) of the Act provides a two-step process for courts to use in

---

4. *Cf. Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 78 (3d Cir.1990). The *Powell Duffryn* court held that the daily maximum, the 7 day average, and the 30 day average were each separate limitations. A single exceedence could violate both the daily maximum and the 30 day average, or both the 7 and 30 day averages (or probably all three). However, the district court counted an exceedence of the 30 day average limit as *one* violation rather than 30 violations. Presumably, it also counted an exceedance of the

7 day average as one violation. The court noted that the district court may have erred in not counting the 30 day average as 30 violations, but did not rule because the parties had waived the argument. The court did not address the duplication problem that might occur if it had counted 30 violations for one exceedence of 30 day average, plus daily maximum exceedences. Moreover, the court did not raise the possibility of counting a violation of the 7 day average as 7 violations.

setting the appropriate civil penalty. 33 U.S.C. § 1319(d). First, a court is to calculate the *maximum* penalties that can be awarded against a violator of the Act. Second, by using the maximum penalty as a guideline, a court is to set the actual penalties by analyzing the specific statutory factors. *See Tyson*, 897 F.2d at 1142. If the court chooses not to impose the maximum penalty, "it must reduce the fine in accordance with the factors spelled out in section 1319(d); clearly indicating the weight it gives to each of the factors and the factual findings that support its conclusion." *Id.*

50. Section 309(d) provides:

Any person who violates ... this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator, or by a State ... shall be subject to a civil penalty not to exceed $25,000 *per day for each violation.*

33 U.S.C. § 1319(d) (emphasis added). .

51. Accordingly, the methodology for calculating the amount of maximum civil penalties in any Clean Water Act case is: (1) determine the categories of violations, (2) add up the number of *daily* violations in each category, (3) total the violations for each category, and (4) multiply this total by $25,000.

52. The city has violated the secondary treatment requirement of the Clean Water Act on 1,645 days from July 1, 1988 to December 31, 1992. On each day, it exceeded the limitations on the mass emissions rates, concentration, and percent removal of both BOD and SS (a total of six parameters) The total number of violation units is therefore 9,870. The maximum civil penalty for these violations is $246,750,000.

53. The city has violated the Clean Water Act a total of 104 times in October and November 1989 for bypass and nonreporting violations. The maximum civil penalty for these violations is $2,600,000.

54. In sum, this court will start its penalty assessment at the maximum penalty amount of $249.35 million.

55. Once a court has calculated the maximum civil penalties under the Clean Water Act, it then proceeds to "step two" for assessing penalties—adjusting downward from this maximum amount based upon five distinct statutory factors.

### C. Statutory Factors in Assessing Civil Penalty

56. Section 309(d) of the Clean Water Act lists five specific factors, and one "catch all" factor, that the Court must consider in setting civil penalties:

In determining the amount of civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d). *See also Tyson*, 897 F.2d at 1140; *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. 1158, 1160 (D.N.J. 1989).

57. Starting from Section 309(d)'s ceiling of maximum civil penalties, the determination of the appropriate civil penalty is a matter within the sound discretion of the trial court. *See U.S. v. Ohio Edison*, 725 F.Supp. 928, 934 (N.D.Ohio 1989) ("Once it has been determined that the terms of the permit have been violated, Section 309(d) provides substantial discretion to the court in determining the amount of penalties.").

### 1. Seriousness of Violations

58. Both the bypasses and the failure to comply with secondary treatment were violations of significant number, duration, and importance.

59. It appears that the city's approach to sewage disposal is that "dilution is the solution to pollution." The testimony before this court has raised serious questions about the potential risks involved in discharging sewage into the ocean. However, it is not the role of the court to evaluate the wisdom of the deep ocean outfall waiver, or whether the city should receive such a waiver. As discussed above, there is no evidence

that the Honouliuli discharge currently poses a threat to public health or the environment. Therefore, the court will consider the lack of measurable material harm to be a significant mitigating factor in assessing penalties for both the bypass and the secondary treatment violations.

### 2. *Economic Benefit*

60. The city argues that it enjoyed no benefit from delaying compliance with secondary treatment because it was not required by the DOH or EPA to build a secondary treatment plant by July 1, 1988. The court has ruled, however, that the city was obligated to treat at secondary levels beginning on that date unless it can statutorily be excused from compliance. Therefore, the city has enjoyed an economic benefit from its secondary treatment violations.

61. Whether the city was aware of that requirement is a factor to be considered in determining the city's good faith efforts to comply.

62. The city has enjoyed a negligible economic benefit from its failure to install the improved bypass weir until after the bypasses occurred. Therefore, the lack of economic benefit will be a mitigating factor in assessing civil penalties for the bypasses.

### 3. *History of Violations*

63. Testimony has alluded to the possibility that bypasses at the Honouliuli plant had occurred prior to October 1989, but were not reported to any outside authority.

64. The evidence is inconclusive, however, to affect any penalty for prior history of similar violations.

65. As noted earlier, the plant has been in continuous violation of the secondary treatment requirement since the compliance deadline of July 1, 1988, and therefore this factor is not applicable to the determination of the penalty.

### 4. *Good Faith Efforts to Comply*

66. The city took no steps to avoid the bypasses that occurred in October and November 1989, since the plant employees believed, for a number of reasons (some valid and others not), that the bypasses were permitted. Therefore, the penalty assessed for the bypass violations can be mitigated only to a limited extent by any good faith beliefs or efforts on the part of the city. The court does recognize that upon being notified that the bypasses might in fact be in violation of the NPDES permit, the city did take steps to prevent similar bypasses from occurring in the future.

67. The city made no good faith effort to comply with the NPDES permit or internal reporting procedures, offering only unpersuasive testimony about the difference between a bypass and an overflow to explain its failure to report the incidents. Therefore, the penalty assessed for the reporting violations will not be mitigated by any good faith efforts.

68. The city's good faith reliance on the DOH interim standards must, however, be a significant mitigating factor in assessing a penalty for the secondary treatment violations. *See United States v. Ohio Edison Co.,* 725 F.Supp. 928, 933–34 (N.D.Ohio 1989) (failure to comply with regulation at least partially mitigated by reliance on EPA and DOH directives that conflicted with regulations).

### 5. *Economic Impact*

69. The impact of a penalty on the city will be a slight increase in the monthly rates paid by users of the sewer system. Therefore, economic impact is not a mitigating factor.

## ORDER

### I. *CIVIL PENALTIES*

70. The civil penalties assessed herein are to be paid forthwith to the United States Treasury.

### A. *Bypasses*

71. Having considered the factors discussed above, the court hereby ORDERS the city to pay civil penalties in the amount of $156,000 for the 52 bypass violations. The amount assessed is less than the statutory maximum because the city's noncompliance is

mitigated by the lack of quantifiable harm, the absence of an economic benefit, and limited good faith efforts to comply.

72. The court hereby ORDERS the city to pay civil penalties in the amount of $312,000 for the 52 violations of the reporting provisions of the NPDES permit. The amount assessed is less than the statutory maximum because the city's noncompliance is mitigated by the lack of quantifiable harm and the absence of an economic benefit.

### B. *Secondary Treatment*

73. Having considered the factors discussed above, the court hereby ORDERS the city to pay civil penalties in the amount of $250,000 for its continuing violation of the secondary treatment requirement. The amount assessed is less than the statutory maximum because the city's noncompliance is significantly mitigated by the lack of quantifiable harm and the city's good faith reliance on the validity of the interim effluent limitations set by the DOH. In addition, the court takes into account the duplicative nature of the various effluent measurements listed in the NPDES permit. The number of violation units is a function of the number of limitations listed in the plant's NPDES permit, and the choice of method to calculate that number does not change the nature and seriousness of the violation.

### II. *EQUITABLE RELIEF*

74. Under the Clean Water Act, courts have broad statutory authority to fashion an appropriate equitable remedy. 33 U.S.C. § 1365(a).

75. The court has considered the relief requested by plaintiffs and in light of the above findings of fact and conclusions of law, ORDERS the following equitable relief:

a. In order to maximize currently available equipment, the city shall operate at least three of its four available primary clarifiers at all times.

b. The expert testimony presented in this case raises concerns about the potential risks involved in the discharge of sewage into the water and highlights the lack of information that is available about impact of sewage at Honouliuli. In recognition of these concerns, the court orders the city to allocate an additional $1 million to the Mamala Bay Study Commission by December 31, 1993, according to the terms of the document creating the Commission, for specific intensive studies of the potential impacts of the Honouliuli discharge on public health and the marine environment. This funding is not to be construed as a penalty, but rather as an additional contribution intended to further safeguard the welfare of this community. The court recommends that the additional funds be used to develop a vigilant monitoring system to detect potential risks to health and environment, in a manner not inconsistent with the original charge of the Commission. *See Sierra Club v. City and County,* Civ. No. 90–00219 ACK, Consent Decree filed November 19, 1991, at 5.

### III. *DECLARATORY RELIEF*

76. The court enters a declaratory judgment against defendant City and County of Honolulu as follows:

a. The court finds that the city is liable for 9,870 violations of the secondary treatment requirements of the Clean Water Act at its Honouliuli wastewater treatment plant between July 1, 1988 and December 31, 1992;

b. The court confirms its earlier ruling that the city recorded 52 bypass and 52 nonreporting violations of the Clean Water Act at its Honouliuli wastewater treatment plant in October and November 1989; and

c. The court finds that plaintiffs are the "prevailing parties" in this litigation for purposes of the attorney fees and cost provision in 33 U.S.C. § 1365(d). Plaintiffs may submit an application for an award of their reasonable attorney fees and costs within thirty days of entry of judgment herein.

IT IS SO ORDERED.