NATURAL RESOURCES DEFENSE
COUNCIL, INC., and Delaware
Audubon Society, Plaintiffs,

v.

TEXACO REFINING AND
MARKETING, INC.,
Defendant.

Civil Action No. 88–263 LON.

United States District Court,
D. Delaware.

Sept. 1, 1998.

C. Scott Reese, Cooch & Taylor, Wilmington, DE, for Plaintiffs; Mitchell S. Bernard, Nancy S. Marks, Natural Resources Defense Council, Inc., of counsel.

Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Defendant.

## OPINION & ORDER
LONGOBARDI, Senior District Judge.

### I. NATURE AND STAGE OF THE PROCEEDINGS

This case presents the Court with the unique opportunity to examine the interplay between constitutional principles, federal and local law, as well as significant public policy concerns. To resolve these issues, the Court must balance the economic and industrial benefits conferred on this state by defendant, and the esthetic, recreational and environmental interests espoused by federal law and guarded by plaintiffs.

In 1988, plaintiffs Natural Resources Defense Council and the Delaware Audubon Society (referred to collectively as "NRDC"),

commenced this citizen's suit under the Clean Water Act ("CWA") alleging that defendant Texaco Refining and Marketing ("Texaco") committed ongoing violations of its National Pollution Discharge Elimination System ("NPDES") permit which allows Texaco's Delaware City Refinery (the "Refinery") to discharge pollutants into the Delaware River.[1]

After a lengthy bench trial, this Court (Roth, J.), found Texaco liable for 365 violations of the permit. *See Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.,* 800 F.Supp. 1 (D.Del.1992) ("*NRDC I*"). Accordingly, the Court imposed a civil penalty and entered an injunction prohibiting Texaco from violating its permit. The United States Court of Appeals for the Third Circuit largely affirmed the district court's opinion, limiting the violations over which the district court exercised jurisdiction and narrowing the scope of the injunction. *Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.,* 2 F.3d 493 (3d Cir.1993) ("*NRDC II*"). On remand, this Court fined Texaco in accordance with the Third Circuit's opinion and entered the following injunction on November 6, 1993:

> Texaco is enjoined from further violations of those parameters of the 1989 NPDES permit over which the Court exercised jurisdiction and which have not been rendered moot by virtue of the relaxed standards of the 1989 permit. Texaco is further directed to comply with the investigatory, reporting, and monitoring provisions of the 1989 NPDES permit.

[D.I. 195].

In June 1995, NRDC moved to enforce the judgment. [D.I. 212]. The gravamen of plaintiff's motion sought to compel Texaco to develop and implement a monitoring program to adequately assess the nature and impact of any noncomplying pollutant discharge into the Delaware River. Moreover, NRDC asked that the Court order Texaco to take reasonable steps to remediate the environmental harm attributable to its prior noncomplying discharges.

At issue in this case is the "adverse impact" section of Texaco's permit. *See* PX 8a. This section provides:

> The permittee shall take all reasonable steps to minimize any adverse impact to the waters of the State or the United States resulting from noncompliance with this permit, including such accelerated or additional monitoring as necessary to determine the nature and impact of the non-complying discharge.

PX 8a at 24 ¶ 16. NRDC argues that the monitoring plan developed for Texaco by ENTRIX, Inc. (the "ENTRIX plan") does not adequately address the terms of the injunction. Texaco, by contrast, contends that the injunction requires only compliance with the permit and that the ENTRIX plan implements monitoring of the type expected by the Delaware Department of Natural Resources and Environmental Control ("DNREC"), the agency charged with enforcement of the permit.

After oral argument on March 1, 1996, the Court granted plaintiff's motion to enforce the judgment. [D.I. 223 at 49]. In so ruling, the Court noted that Texaco placed emphasis on the word "monitor" whereas NRDC's primary concern was "impact." *Id.* The differences in the parties' approach to the adverse impact section of the permit could best be described as a quantitative view taken by Texaco and a qualitative reading urged by NRDC. The Court found that the purposes of the CWA were best served by a qualitative approach. The extent of the required monitoring program hinged upon the feasibility of scientifically determining the impact of non-complying discharges. The Court left for another day the contours of an appropriate

---

1. The Refinery is now owned and operated by Star Enterprises, a partnership between Texaco and a subsidiary of the Saudi Arabian Oil Company. *Natural Resources Defense Council v. Texaco Refining and Marketing,* 800 F.Supp. 1, 5 n. 1 (D.Del.1992). The United States Court of Appeals for the Third Circuit addressed the change in the Refinery's ownership in its opinion noting that Texaco owned the refinery at the commencement of this lawsuit, and that as a successor in interest Star is bound by any judgment in this matter. *Natural Resources Defense Council v. Texaco Refining and Marketing,* 2 F.3d 493, 506 (3d Cir.1993). The court dismissed the issues surrounding the change of ownership as lacking merit. *Id.*

monitoring program. Resolution of the issue requires an analysis of both the scientific feasibility of determining impacts and a legal conclusion regarding what is required under the terms of the injunction.

In response to the Court's ruling, the parties presented the Court with a stipulated statement of the issues. [D.I. 226]. Accordingly, the issues before the Court are:

1. In order to comply with paragraph 4 of the Court's November 6, 1993 Order and Section II.A.4 of the NPDES permit, what steps does [Texaco] have to take to determine the nature and impact of future noncomplying discharges by the Delaware City Refinery? ...

2. Is Texaco's "NPDES Permit Exceedance Response Plan" dated June 15, 1993 ... which was prepared ... by ENTRIX Inc., adequate to determine the nature and impact of future noncomplying discharges ...? In what way(s), if any, is the Response Plan inadequate?

3. With respect to discharges by the Delaware City Refinery in excess of NPDES permit limits from March 1993 to the present, is it scientifically possible to determine now the impact, if any, of such discharges? Assuming it is scientifically possible to determine the impact of such discharges, what specific steps would Texaco have to take to do so?

[D.I. 226].

After attempting to resolve the issues informally, the parties nominated experts to assist the Court in reaching a conclusion. The Court appointed Jay C. Means, Ph.D. an expert nominated by Texaco. His report addressing the stipulated issues found the ENTRIX program to be "technically flawed" and recommended five studies as a precursor to a scientifically-defensible monitoring program. He concluded that monitoring the impact of future noncomplying discharges is possible, and further that it is feasible to determine the impact of past noncomplying discharges. On April 13–14, 1998, the Court heard testimony from Dr. Means, NRDC's expert, Dr. Livingston, and Texaco's expert, Dr. Markarian. This Opinion represents the Court's findings of fact and conclusions of

law regarding an appropriate monitoring program.

## II. SCIENTIFIC FEASIBILITY OF DETERMINING IMPACTS

### A. Impact of Future Noncomplying Discharges

The experts in this case testified about both Dr. Means's report and the ENTRIX plan currently in place at the Refinery. All the experts agreed on one proposition: the differences in the plans are fundamental. Texaco's expert and author of the ENTRIX plan, Dr. Markarian, expressly stated that the ENTRIX plan, "does not purport to measure impact." Tr. at 383. Conversely, Dr. Means's report specifically addressed the questions surrounding measuring adverse impacts from noncomplying discharges.

As a starting point of his analysis, Dr. Means described the dynamic environment into which Texaco discharges its pollutants. The Refinery's discharge site is in a canal off the main channel of the River and secluded behind Pea Patch Island. The effluent is discharged into an estuary, a body of water between the ocean and the River containing both salt and fresh water properties. Tr. at 201. Dr. Livingston expanded on Dr. Means's explanation of an estuary describing the area as a particularly valuable natural resource which produces an enormous amount of life. Id. Because of the unusual properties of the estuary and its propensity to support living organisms, the area is particularly important to both sport and commercial fisheries. Id. Dr. Livingston's description of the discharge site reinforces the significance of the area for recreational as well as commercial or industrial purposes.

Dr. Means's report outlined five studies which would enable Texaco to design a monitoring program capable of determining the impact of future noncomplying discharges. Dr. Means noted that one must understand the effect of the compliant discharge before distinguishing the impact of the noncompliant discharges. In addition, the studies would enable Texaco to faster pinpoint the source of the noncompliant discharge and improve reaction time.

The first step to the development of a monitoring program, according to Dr. Means, would require the Refinery to characterize the chemical properties of the effluent stream. Petroleum industry effluent contains "literally hundreds of organic compounds and a lessor number of elemental substances." PX 8a at 4. The organic material contained in refinery effluent is often regulated under the broad heading of oil and grease and total organic carbon. Tr. at 168; PX 8a at 4–5. In Dr. Means's opinion, measurement of "oil and grease or total petroleum hydrocarbons provide no useful information for making risk or damage assessments." PX 2a at 5; Tr. at 29. The oil and grease fraction of the effluent can be categorized under two general subheadings: normal hydrocarbons and aromatic hydrocarbons. PX 8a at 4. Normal hydrocarbons are relatively innocuous if not discharged at huge levels. Tr. at 45.

By contrast, aromatic hydrocarbons or, more specifically polynucleated (or polynuclear) aromatic hydrocarbons ("PAHs"), are as a class more toxic and can cause a wide range of deleterious effects on living systems. Id.; PX 8a at 5. Dr. Means elaborated on the reasons for concern associated with PAHs. First, PAHs are more persistent in the environment because they are not as susceptible to biodegradation as normal hydrocarbons. To complicate matters, the fact that PAHs are discharged into a saline environment such as the estuary further reduces the solubility of the PAHs. Tr. at 45; PX 8a at 16. Second, exposure to PAHs can cause mutations of DNA and even cancer in living organisms. Tr. at 46–47. The third area of concern is the ability of PAHs to be transferred from the sediment to living organisms. Id. at 48. Thus, the material can move from a nonliving system to a living system. Id. This final point of concern is profound because the accumulation of PAHs in the sediment may result in exposure to higher concentrations of PAHs. Id.

To be effective, a monitoring program should focus on the potential effects of PAHs, the truly harmful component of the Refinery's effluent. Although PAHs may constitute only five percent of the oil and grease fraction of the Refinery's effluent discharge, [tr. at 47], the impact of PAHs is environmentally critical. Dr. Means determined that a chemical characterization of the effluent stream is necessary to perform a scientifically-valid assessment of the impacts of noncomplying discharges.

The second study proposed by Dr. Means is one of fate and transport. This study is necessary to determine the impact of noncomplying discharges on living systems because it defines the route of exposure. Tr. at 60. Dr. Means testified that the estuary environment accumulates PAHs in different ways. First, the substances interact with the water even though the bond formed is weak. PX 8a at 17; Tr. at 53. The substances also settle out of the water column and into the bedded sediments where it is preserved for long periods of time. Tr. at 53. Unlike normal hydrocarbons, PAHs do not degrade rapidly, therefore their accumulation poses additional risks. Food chain transfer of the PAHs presents the basis for other studies.

Dr. Means testified that the fate and transport study must be conformed to site-specific evaluation. In his report and through his testimony, Dr. Means outlined the factors which limit the predictability of fate and transport models. The characteristics of the estuary itself cannot be predicated on models because of local variations in homogeneity. PX 8a at 18. To determine what kinds of processes are occurring in the River regarding the bonds formed by PAHs and other materials and the rate of the processes, a study of the particular environment is necessary.

The third and fourth studies focus on bioavailability, a term used to describe how materials get into living tissue. Tr. at 57. The two subjects of the bioavailability studies are the water column itself and the sediment. This twofold approach to studying bioavailability would be necessary because of the various ways in which PAHs can accumulate in living systems. Significantly, Dr. Means noted that the presence of PAHs in living tissues can actually exceed the concentrations found in the surrounding environment.

The final step in Dr. Means's proposal is the establishment of a baseline for the area

beyond the discharge canal. A baseline would make it possible to discriminate between the effluent discharged by Texaco and the activities of other permitted discharges along the River. Tr. at 52. Moreover, the establishment of a baseline is essential in distinguishing between the effects of permitted and unpermitted discharge. Tr. at 63.

Development of a baseline would involve collection of background data such as the source of specific components of the effluent material and a study of surface sediments from just outside the discharge canal. The baseline information would be an important source for understanding how the system is functioning, the rate at which it is functioning, and the current chemical and biological status of the environment. With this information in hand, Texaco could then make informed models for toxilogical evaluation of its compliant discharge as opposed to the impact of noncompliant discharges. Tr. at 62–63.

Another component of Dr. Means's proposal is the inclusion of reference sites. Dr. Means explained the importance of both a chemical reference site as well as a biological reference site. A chemical reference site could describe the processes occurring upstream from the Refinery and lead to an understanding of what is coming into the Refinery's discharge area from other permitted dischargers. A biological reference site would be an area similar in properties to the location surrounding the discharge canal. This biological reference site could then be used to interpret the impact of complying versus noncomplying discharges.

Dr. Means concluded that, once the information from these studies is obtained, Texaco can develop a scientifically-defensible exceedance response plan which accounts for the source of the noncompliant discharge and its route for assimilation into the estuarine environment. Using the knowledge gained from the studies, Texaco would be able to determine both the chronic and acute impact of its noncompliant discharge.[2]

While Dr. Means's proposal focuses on understanding site-specific phenomena, the ENTRIX plan was formulated using assumptions based upon pre-existing literature. Tr. at 292. Texaco's expert and author of the ENTRIX plan, Dr. Markarian, viewed the response plan as an accelerated version of the routine monitoring required by the NPDES permit. Id. at 294. The ENTRIX plan focuses on studies of the water column where, Dr. Markarian testified, the effluent is in its most concentrated form. Id. at 298.

In the event of exceedant discharge, the ENTRIX plan calls for bioassay testing. This testing uses fathead minnows and mycid shrimp exposed to undiluted effluent. Dr. Markarian stated that this exposure provides useful information in understanding the severity of the exceedance. Tr. at 300. In addition, Dr. Markarian noted that his plan does not address sediment testing because, in his view, such sampling is irrelevant to monitoring short-term events. Id. at 333.

Both Dr. Means and Dr. Livingston criticized the ENTRIX plan as "technically flawed," [PX 8a at 59], and "inadequate" from a scientific perspective. Tr. at 42 (Means); Id. at 242–43 (Livingston). Dr. Means expressed his opinion of the plan stating, "it focuses on the 95 percent of things that are not of concern rather than the 5 percent of things that are." Id. at 93. The crux of the ENTRIX plan is the measurement of acute toxicity. Id. at 88 (Means); Id. at 236 (Livingston). As Dr. Means explained, however, not all adverse effects are observed in short order; the effect of an exceedance can manifest in chronic toxicity. Id. at 88. Dr. Livingston echoed this testimony noting that the Refinery's effluent is not acutely toxic. Id. at 239. In response, Dr. Markarian repeatedly emphasized that the ENTRIX plan was never designed to measure impacts. Id. at 307–08.

**2.** Dr. Means carefully explained that the impacts of noncomplying discharges can be manifested in acute and chronic forms. Tr. at 425. Chronic effects can result from short term exposure. Id. Dr. Means recounted studies where organisms were exposed to toxins for relatively brief periods of time yet effects such as tumors manifested much later. Id. Thus, Dr. Means emphasized that the noncomplying discharges, though brief in duration, can have persistent environmental effects.

Although Dr. Markarian expressed doubts about monitoring the impacts of future non-complying discharges, the Court finds Dr. Means's conclusion to be well-reasoned and credible. Dr. Livingston voiced support for the recommendations of Dr. Means finding his proposal excellent and would only add an ecological overlay to the studies. Thus, the Court concludes that it is scientifically possible to determine the impact of future non-complying discharges. The testimony is clear, however, that the ENTRIX plan was neither designed to measure impacts nor equipped to do so.

B. *Impact of Past Noncomplying Discharges*

Dr. Means was also charged with determining whether the impact of past noncomplying discharges could be determined in retrospect. He answered this question affirmatively, and outlined a protocol for completing the task. Although he expressed confidence in the process of determining past impact, he noted that there are complexities and uncertainties attendant to the mission. The proposed approach to determine the impact of past exceedances would be undertaken in three steps. First, long core samples of the sediment would be taken. Second, radioisotope dating would be conducted to narrow the range of sediment within the time frame of a year. Finally, to further refine the time frame, chemical analysis of the sediment would be conducted.

To commence determination of past impact from noncompliant discharges, Dr. Means testified that it would be necessary to establish the depositional rate. Tr. at 99. New sediment is constantly deposited on existing sediment through a process referred to as burial. Because of the restricted flow area in the waters surrounding the discharge canal behind Pea Patch Island, Dr. Means hypothesized that the depositional rate would be higher than the estimate of the Army Corps of Engineers for the estuary. *Id.* Dr. Means testified that calculation of the depositional rate would be routine practice for a sedimentologist. An understanding of the depositional rate provides the context for understanding the data provided by the long core samples. *Id.*

Dr. Means stated that each layer of the sediment would produce a representative history of what happened at the site over a particular period. To determine at what point in time the sediment was deposited, scientists could use radio dating techniques such as carbon 14 and lead 210. *Id.* at 101. Using these radioisotope techniques, scientists would be able to date the sediment column to within a particular year, such as 1993 or 1994. Because the parameters of radioisotope dating's temporal precision extend to one year, for more specific dating, chemists could analyze the sediment sample and compare it to events at the Refinery to determine the impact of the noncompliant discharge. As Dr. Livingston noted, the chemistry would compensate for radioisotope dating's lack of precision. *Id.* at 244.

Fortuitously, Dr. Means and Dr. Livingston concur in the conclusion that the protocol suggested for determining the impact of noncompliant discharges would understate the effect of the exceedance's impact. *Id.* at 108, 255. The reason for the understatement of the effects would be that, although it occurs slowly, the PAHs are susceptible to some biodegradation. *Id.* at 108. Moreover, the determination of any past impact would only be possible for an exceedance that lasted long enough to be integrated into the system.

NRDC questioned Dr. Means about data obtained from exceedances in January and February 1994, Texaco's most significant period of noncompliance. Dr. Means opined that using the methods he proposed the impact of that exceedance period could be measured. *Id.* at 104.

Dr. Means also discussed the overlap between the proposed studies integral to monitoring the impact of future noncomplying discharges with the protocol to measure past impacts. In this regard, Dr. Means pointed to the usefulness of a reference site to determine the effect of the Refinery's effluent as distinguished from other activity in the area such as run-off from agricultural fields. *Id.* at 105. Moreover, Dr. Means indicated that any determination of impact from past non-

complying discharges would have to be examined within the confines of the Refinery's history and take into account events such as dredging and legal discharges.

The testimony demonstrated that determining the impact of past noncomplying discharges is possible although complex. The experts agree that any measure of impact from past noncomplying discharges would provide conservative estimates given the biodegradation of PAHS. Having concluded that it is scientifically possible to determine the impact of both future and past noncomplying discharges, the Court must turn its attention to what measures Texaco is required to take to comply with both the letter and spirit of the law.

### III. MOTION TO ENFORCE THE JUDGMENT

■ The procedural context in which this dispute arises is a motion to enforce the judgment. A motion to enforce the judgment is the proper method to seek the Court's assistance in interpreting a prior order. *Jones v. Cleland,* 515 F.Supp. 212, 213 n. 1 (N.D.Ala.1981); *see, e.g., United States v. New York Telephone Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (federal court has the power to issue commands effectuating prior orders). Such a motion should be utilized to compel compliance with a prior decision especially in cases of wilful or deliberate violation of a court order. *Gregris v. Edberg,* 645 F.Supp. 1153, 1156 (W.D.Pa.1986), *aff'd,* 826 F.2d 1054 (3d Cir.1987).

■ A motion to enforce the judgment is not an opportunity to relitigate matters raised in the prior proceeding. *Pittsburgh Terminal Corp. v. Baltimore and Ohio R.R. Co.,* 824 F.2d 249, 253 (3d Cir.1987). Rather, the motion is one of independent significance related to developments occurring after entry of judgment. *Id.*

NRDC alleges that Texaco has not complied with either the letter or spirit of Judge Roth's Opinion and this Court's injunction. Texaco contends that the ENTRIX plan fulfills its obligation. Because the parties have reached an impasse in interpreting the meaning of the Court's prior order, a motion to enforce the judgment is an appropriate procedural vehicle.

### IV. MOOTNESS

As a preliminary matter, Texaco suggests that the case is now moot because the injunction specifically mandates compliance with an expired permit. Because a court must always satisfy itself of its jurisdiction to proceed, *Van Holt v. Liberty Mut. Fire Ins. Co.,* 143 F.3d 783, 786 (3d Cir.1998), the Court will examine whether the action is now moot.

The mootness doctrine is rooted in the "case or controversy" requirement of Article III, § 2 of the United States Constitution. *Spencer v. Kemna,* 523 U.S. 1, 118 S.Ct. 978, 983, 140 L.Ed.2d 43 (1998); *see also Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) ("Under Article III of the Constitution this Court may only adjudicate actual, ongoing controversies."); *Nebraska Press Ass'n. v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) ("[J]urisdiction under Art. III, § 2, of the Constitution extends only to actual cases and controversies."). In *Nebraska Press Association,* the Supreme Court reiterated the well-settled principle that "jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one 'capable of repetition, yet evading review.'" *Id.* (quoting *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911)).

In *Powell Duffryn,* the Third Circuit struck language from an injunction relating to future NPDES permits as lacking in specificity. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 83 (3d Cir.1990). In accordance with the Third Circuit's decision in *Powell Duffryn,* the injunction in this case was limited to the permit in effect at the time of the entry of judgment, the 1989 permit. *See NRDC II,* 2 F.3d at 507. The 1989 permit expired on January 31, 1994. PX 8a. Nevertheless, an expired permit will govern the terms of discharge until the issuance of a new permit. *NRDC II,* 2 F.3d at 504 n. 8.

DNREC issued a superseding permit that became effective September 1, 1997.

Texaco's 1997 NPDES permit contains an adverse impact section identical to that of the 1989 permit. PX 9a at 21 (permit section II.A.4). Thus, the requirement of monitoring the adverse impact of noncomplying discharges remains at issue. The problem is therefore capable of repetition.

■ Furthermore, the Court could not reconcile the anomalous result of finding this action moot when the motion was initially made in May 1995, while the 1989 permit was in effect. NRDC indicates that the injunction should be modified because compliance was never achieved during its term. Although no party is to blame for the delay in judicial resolution of the monitoring issue,[3] it defies logic to allow a party to benefit from prolonging litigation. Bearing in mind that "[t]he judiciary must not close the door to the resolution of the important questions these concrete disputes present," *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 127, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), the Court concludes that this action is not moot despite expiration of the 1989 permit because the issue is capable of repetition yet evading review.

## V. REQUIREMENTS OF THE PERMIT

Texaco argues that the current dispute is best resolved by looking to what is required under the NPDES permit. NRDC seeks vindication of its position through a detailed analysis of Judge Roth's Opinion. These positions are not inconsistent. Interpretation of what is required under both *NRDC I* and the permit are inextricably intertwined because the Court's Opinion relied upon the language of the permit.

To put the present controversy in perspective, an overview of the system envisioned under the CWA is appropriate. These principles guided the Court in *NRDC I* and continue to inform this Court's understanding of the pending issues.

The objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under the CWA, the discharge of a pollutant is strictly prohibited unless made in accordance with a NPDES permit. 33 U.S.C. § 1311. Section 1342 of Title 33 sets forth the NPDES program authorizing the Administrator of the Environmental Protection Agency ("EPA") to issue permits for the discharge of pollutants notwithstanding the "zero discharge" standard of § 1311. Once a state has established a permitting program approved by the EPA, the federal permitting will be suspended. 33 U.S.C. § 1342; 40 C.F.R. § 123.1(d)(1). In Delaware, the authority to issue NPDES permits has been vested in DNREC.

While states must be at least as stringent as the EPA, they are free to develop standards exceeding those set by the EPA. 40 C.F.R. § 123.1(I). "The implementation and enforcement of the NPDES program depend to a large extent on self-monitoring." Lynn W. Gallagher, *Clean Water Act,* in Environmental Law Handbook 135, 145 (Thomas F.P. Sullivan, ed., 13th ed.1995). To date, DNREC has not specified what type of monitoring is required for a permit holder to be in compliance with the adverse impact section of the NPDES permit. Indeed, DNREC has never required a monitoring program in spite of the fact that their permit provides for their use. Accordingly, in Delaware, the regulatory agencies and the public rely on the measures taken by the NPDES permit holders, like Texaco, to monitor their discharge.

### A. *Monitoring of Adverse Impact*

At the outset of this litigation, NRDC sought injunctive relief directing the Refinery "to sponsor a monitoring program adequate to assess the nature and impact on the receiving waters of its prior and any future noncomplying discharges." *NRDC I,* 800 F.Supp. at 7. At trial, NRDC argued that Texaco derived an economic benefit from its failure to monitor the environmental impact of its noncomplying discharges. *Id.* at 24.

---

**3.** Indeed, the parties should be commended for their sincere efforts to resolve the dispute at all stages of the litigation. A review of the record shows a plethora of activity which finally resulted in resolution through compromise of many of these disputes.

The Court found that Texaco made no effort to understand the impact of its pollutant discharge on the receiving waters of the Delaware River. *Id.* Noting that Texaco did "monitor the 'nature' of the noncomplying discharges but has never attempted to monitor the 'impact' of the same," the Court concluded that Texaco had not complied with the adverse impact section of the permit. *Id.*

Through the testimony of Dr. Livingston, NRDC explained at trial what they believed to be an appropriate monitoring program. The monitoring proposed by plaintiff at that time included "scientific evaluation of the discharge area, establishment of sampling stations, examination of species for levels of chemicals, quarterly sampling of organisms, and special occasional sampling." *Id.* at 25. The Court therefore had the opportunity at trial to consider a monitoring program similar to that recommended by Dr. Means. The significant differences in the proposed programs are the inclusion of the species testing and organism sampling. Like the testimony presented to the Court in connection with the pending motion, the experts at trial did not refer to the requirements of a specific permit. Instead, Dr. Livingston, like Dr. Means, properly addressed the monitoring issue from a scientific perspective.

For its failure to abide by the adverse impact monitoring requirement contained in the permit, the Court determined that Texaco realized an economic benefit in the amount of $900,000 for ignoring its duty to monitor adverse impacts. *Id.* at 25. In so ruling, the Court specifically found that "the plain language [of the permit] requires Texaco to take affirmative steps to ascertain and mitigate any adverse impact of its nonconforming discharge." *Id.* The Court reached this conclusion despite the testimony of a DNREC representative, an employee of the State of Delaware, that the monitoring proposed by NRDC was not required under the permit. *Id.*

In balancing the equities while considering the appropriateness of injunctive relief, the Court concluded that requiring Texaco to comply with the permit's monitoring provisions would not unduly burden Texaco. *Id.* at 28. Moreover, the Court concluded that

the public interest, as revealed by the spirit and intent of the CWA, would best be served by mandating the implementation of a monitoring program. *Id.* After considering these factors, the Court determined that injunctive relief was appropriate. *Id.* The Court then ordered Texaco to comply with the investigatory, reporting and monitoring requirements of the permit, but did not prescribe the precise details of a monitoring program. The Court indicated that Texaco might have to hire additional personnel to investigate the causes of permit violations and determine impacts. *Id.* at 25.

On appeal, Texaco challenged the monitoring aspect of the injunction as impermissibly vague. Like the district court, the Third Circuit did not address the details of a monitoring program, but specifically upheld the portion of the injunction requiring Texaco to comply with the monitoring requirements of the permit. *NRDC II,* 2 F.3d at 507 n. 12.

■■■■ Because both the Court's Opinion and the terms of the injunction itself rested upon what is required under the permit, it appears appropriate to look to the permit to determine the parameters of a required monitoring program. Interpretation of a permit provision is a question of law for the Court to decide. *United States v. Weitzenhoff,* 35 F.3d 1275, 1287 (9th Cir.1993); *California Public Interest Research Group v. Shell Oil Co.,* 840 F.Supp. 712, 716 (N.D.Cal.1993); *Student Public Interest Research Group v. AT & T Bell Laboratories,* 617 F.Supp. 1190, 1205 (D.N.J.1985); *Student Public Interest Group v. American Cyanamid Co.,* 1985 WL 186630 (D.N.J. Nov.6, 1985). The Court must interpret a NPDES permit in the same manner in which it would interpret a contract or other legal document. *Northwest Environmental Advocates v. City of Portland,* 56 F.3d 979, 982 (9th Cir.1995). Where the terms of the permit are ambiguous, the Court may look to extrinsic evidence to discern the permit's meaning. *Russian River Watershed Protection Committee v. City of Santa Rosa,* 142 F.3d 1136, 1141 (9th Cir. 1998). In construing a permit provision, the Court should defer to the interpretation of the agency charged with enforcement of the terms. *See, e.g., Beazer East, Inc. v. United*

*States Environmental Protection Agency,* 963 F.2d 603, 606 (3d Cir.1992) (discussing agency's interpretation of its own regulations); *New Jersey Department of Environmental Protection and Energy v. Circuit Foil USA, Inc.,* 1993 WL 118195 (D.N.J. Apr.12, 1993) (deferring to state agency's interpretation of the permit language).

The permit itself clearly does not establish the details of a monitoring program specifically addressed to the measurement of adverse impacts of noncomplying discharges. As the Court determined in *NRDC I,* however, the permit contemplates that more will be done than the routine monitoring elaborately set forth in the permit. *See NRDC I,* 800 F.Supp. at 24 ("normal operation is covered in a separate section of the permit"). The permit's special conditions do require some testing similar to that described by Dr. Means such as annual analysis of "an external quality control reference sample for each pollutant," PX 8a at 21, and quarterly testing of PAHs conducted concurrently with biological toxicity testing. *Id.* at 31. The 1997 permit contains the same provisions.

Texaco argues that the Court should consider the testimony of a DNREC representative in examining what type of monitoring program is required to measure adverse impacts. NRDC urges the Court to disregard this testimony as barred by the law of the case doctrine. To support its contention, NRDC claims that the Court has previously disregarded DNREC's intent and that this issue should not be relitigated.

In discussing the adverse impact monitoring required under the permit, Judge Roth discredited the testimony of a DNREC representative, Mr. Janiga. *NRDC I,* 800 F.Supp. at 25. Mr. Janiga testified that the monitoring program explained by NRDC at

trial was not required under the terms of the NPDES permit. *Id.* In spite of that testimony, the Court held that the plain language of the permit required some monitoring.[4] *Id.*

▇▇▇ The law of the case doctrine " 'expresses the practice of courts generally to refuse to reopen what has been decided.' " *Williams v. Runyon,* 130 F.3d 568, 573 (3d Cir.1997) (quoting *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912) (Holmes, J.)). There are three traditional exceptions to the law of the case doctrine: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Patel v. Sun Co., Inc.,* 141 F.3d 447, 461 n. 9 (3d Cir.1998). The doctrine does not limit the power of a court to reconsider a prior opinion. *Williams,* 130 F.3d at 573. Rather, it imposes prudential considerations upon courts when doing so. *Id.* When revisiting a previously decided issue, the Third Circuit has instructed district courts to explain its reasons on the record and take steps to ensure that the parties are not prejudiced by reliance on the prior ruling. *Id.*

▇▇▇ The Court concludes that the law of the case doctrine does not bar consideration of the testimony of a DNREC representative. The Court's prior ruling merely established the principle that some monitoring was required pursuant to the adverse impact section of the permit. The Court did not, however, rule upon the specifics of a monitoring program.[5] Because the issue before this Court is determining the details of the monitoring program, DNREC's testimony could shed light on the permit's requirements. Accordingly, the Court will consider the testimony of R. Peder Hansen, the author of Texaco's NPDES permit.[6]

4. Specifically, the Court stated, "Regardless of Janiga's view of the permit, we believe that its plain language requires Texaco to take affirmative steps to ascertain and mitigate any adverse impact of its nonconforming discharges." *NRDC I,* 800 F.Supp. at 25.

5. Even if the Court were to construe the sentence upon which plaintiffs rely as permanently foreclosing DNREC testimony in this matter, the Court has taken adequate measure to reconsider the prior ruling. First, the Court has explained

that the agency's interpretation of the permit should be considered if not in conflict with the plain language of the permit. Second, the Court requested that the parties brief the issue regarding acceptance of the testimony of the agency representative.

6. At the hearing, the Court accepted the videotape deposition of Mr. Hansen and reserved decision upon whether the testimony would be considered.

Mr. Hansen testified that the adverse impact section of Texaco's NPDES permits is a standard provision included in all NPDES permits issued by DNREC. DX 11a at 10. The origin of the provision is presumably a 1972 memo from the EPA discussing the general content of an appropriate permit. Neither DNREC nor the EPA has promulgated an official interpretation of the language. In Mr. Hansen's experience, the meaning of the provision is derived from an oral history among the permit writers. Mr. Hansen stated that the meaning of the provision is whatever interpretation the person currently occupying his position at DNREC ascribed to the language.

In Mr. Hansen's opinion, the adverse impact section addresses immediate action to minimize the impact of an exceedance. *Id.* at 23–24. DNREC measures impact by examining the magnitude and duration of an exceedance. *Id.* at 18. Mr. Hansen interprets the reference to accelerated or additional monitoring included in the section to provide examples to the permittee of action to take upon recognition of the exceedance. *Id.* at 16–18. The information gleaned from the impact monitoring assists DNREC in calculating when the permittee can resume compliance with the permit limits. *Id.* at 17.

When asked about agency interpretation of the requirements of adverse impact monitoring, Mr. Hansen stated that DNREC would not approve a monitoring program in advance for policy purposes. *Id.* at 27–28. DNREC's purpose in this regard is to maintain "maximum flexibility" when confronted with the particular circumstances of an exceedance. *Id.* For this reason, DNREC declined Texaco's request to include a specific reference to the ENTRIX plan as a special condition of the 1997 permit.

Mr. Hansen further testified that to his knowledge DNREC never required the type of monitoring proposed by Dr. Means in connection with the adverse impact provision. The type of monitoring DNREC expects in order to be in compliance with the adverse impact provision is an increase in measuring frequency and action such as skimming with booms to minimize oil and grease exceedances.

Mr. Hansen's testimony is consistent with that of Mr. Janiga's trial testimony. As Judge Roth noted the plain language of the permit requires monitoring to assess adverse impact, and the Court subsequently rejected the state's interpretation of the permit. In connection with this motion, this Court concluded that the monitoring program should have qualitative and quantitative attributes, thus defining the thrust of Judge Roth's Opinion.

As Mr. Hansen indicated when testifying, DNREC officials did not incorporate the Court's interpretation of the adverse impact section in its regulatory scheme. Until his deposition, Mr. Hansen was not aware that the Court ruled that an adverse impact monitoring program was required under the permit. *Id.* at 55. Moreover, Mr. Hansen expressed disagreement with the Court's interpretation of the permit. *Id.* at 51. Mr. Hansen's testimony reinforced the premise that the agency's interpretation of the permit requirements is at odds with the permit's plain language and the Court's instructions. Because the agency's interpretation of the permit is contrary to the permit's plain language, the agency should not be accorded deference.

Texaco urges the Court to provide DNREC with "maximum flexibility" to enforce its permit. Mr. Hansen recognized that DNREC would be within its authority to order the monitoring suggested by Dr. Means if the situation dictated that it would be appropriate to do so. This suggestion only reinforces the appropriateness of implementing the program. "[T]he purpose behind the citizen suit provision was 'to both goad the responsible agencies to more vigorous enforcement of the antipollution standards and, if the agencies remained inert, to provide an alternative enforcement mechanism.'" *SPIRG v. Fritzsche, Dodge & Olcott, Inc.,* 759 F.2d 1131, 1136 (3d Cir.1985) (quoting *Baughman v. Bradford Coal Co.,* 592 F.2d 215 (3d Cir.1979)).

When a state agency that has the power to fulfill its obligations defers to other pressures, it abdicates its duty to act. Be those pressures political, economic or otherwise,

the result is the same. In this case, the spirit and intent of the CWA is frustrated and the law of the land is submerged to other interests. It is in this context that federal courts have traditionally been called upon to exercise their jurisdiction by dragging reluctant state officials into compliance with our Constitution and federal laws. Under these circumstances, it is the obligation of this Court to enforce the plain meaning of the permit.

Judge Roth concluded that "the plain language of the permit requires Texaco to take affirmative steps to ascertain and mitigate any adverse impact of it nonconforming discharges." *NRDC I,* 800 F.Supp. at 25. The Court recognized Texaco's failure to abide by the monitoring requirement to be an "omission." *Id.* at 27.

Despite DNREC's interpretation of the permit, the permit itself mandates monitoring the impact of the noncomplying discharge. The permit does not refer to potential impacts based upon supposition and speculation. It requires Texaco to take affirmative action to study the environmental effects of its noncomplying discharges. *See NRDC I,* 800 F.Supp. at 25. The question remains, therefore, whether the ENTRIX plan is adequate to carry out the task.

From a scientific perspective Dr. Means and Dr. Livingston determined that the EN-TRIX plan cannot measure impacts. Dr. Markarian did not refute the assertion; rather, he emphasized that the plan was not designed to determine impacts. The plan is therefore, by Dr. Markarian's own definition, inadequate to meet the permit's requirements as interpreted by the Court.

Texaco contorts Dr. Markarian's testimony to draw distinctions between measuring immediate impact on the water quality and determining past impact in the sediment. Had that been the meaning of Dr. Markarian's words, it should have been elicited during the hearing. Instead, Dr. Markarian repeatedly stated that the plan was not intended to measure impacts and did not draw a distinction between future noncomplying discharges and past noncomplying discharges.

Beyond the central objective of the EN-TRIX plan, plaintiffs' demonstrated its faults in several respects. For instance, during the greatest period of permit noncompliance, January and February 1994, the plan could not be executed because freezing temperatures prevented employees from taking in-river samples.

Time after time, Dr. Markarian testified that he did not take a specified action because it was not in his proposal, or that the plan was limited because Texaco would not fund a study. It appears that the whole development of the ENTRIX plan is based on assumptions that in the end support the implementation of the plan. In other words, a circular argument that amounts to nothing more than boot-strapping. As such, the EN-TRIX plan does meet the requirements of the permit.

Judge Roth considered the trial testimony of Dr. Livingston outlining plaintiffs' proposed monitoring program. As noted previously, Dr. Livingston's plan resembled the recommendations of Dr. Means but also included ecological studies. The Court reserved decision on whether the Livingston plan was required under the permit. *Id.* at 24 ("whether the permit requires the monitoring program requested by the plaintiffs is another issue").

Texaco argues that the Court's omission of a directive to immediately implement the Livingston plan constitutes a rejection of such a plan. This argument lacks merit. Although the Court could have ordered implementation of the Livingston plan, its failure to do so cannot be considered an outright rejection. The language of the Opinion clearly suggests that some sort of plan would have to be implemented to determine adverse impact. At that time, the issues were not narrowly focused on the scientific feasibility of assessing impacts. The testimony presented in connection with the present motion demonstrated that the only valid measurement of impacts is a program like that proposed by Dr. Means.

Texaco contends that Dr. Means's program contradicts the permit, and would restrict DNREC's ability to enforce the permit. The implementation of an adverse impact moni-

toring program would not inhibit DNREC's ability to impose other conditions or direct the Refinery to take specific action during an exceedance. Providing DNREC with more information cannot realistically be characterized as violating the conditions of the permit. Moreover, carrying out Dr. Means's program would not prompt the anomalous result of Texaco violating the permit in order to comply with it. The elaborate monitoring required by the permit and 40 C.F.R. Part 136 relates to Texaco's routine monitoring, not to adverse impact monitoring. Implementation of an adverse impact monitoring program does not detract from Texaco's responsibilities under the regulatory scheme; rather, it fulfills its obligations.

Texaco further argues that a program like that described by Dr. Means should not be implemented because the experts were not aware of similar programs elsewhere in the country. The Court finds this argument unconvincing. First, the experts testified only as to their understanding of the feasibility of determining impacts. Neither Dr. Means nor Dr. Livingston purported to be experts in implementation of EPA-approved study mechanisms. Second, other courts have imposed monitoring requirements greater than the studies proposed in this case.

For example, in *Hawaii's Thousand Friends v. City and County of Honolulu,* 821 F.Supp. 1368, 1397 (D.Haw.1993), the court exercised its equitable power ordering Honolulu to allocate one million dollars "for specific intensive studies of the potential impacts of the [wastewater treatment plant's] discharge on public health and the marine environment." The court granted this equitable relief despite finding that Honolulu "currently conducts comprehensive monitoring of the water quality at the plant and in the receiving waters, of the biological community in the area of the outfall, of the sediment in the vicinity of the sewage discharge, and of the outfall/diffuser itself." *Id.* at 1385. Despite this comprehensive monitoring scheme, the court determined that more studies needed to be conducted to determine the plant's adverse impact on the environment. *Id.* at 1387. The court carefully noted that the one million dollars did not constitute a penalty but should be viewed as a contribution to "further safeguard the welfare of this community." *Id.*

A comparison to the monitoring conducted by Honolulu at the outset of the litigation in *Hawaii's Thousand Friends* underscores Texaco's flaws. Unlike Honolulu, Texaco conducts no sediment analysis and no study of the biological community near the outfall. As a result, Texaco has no meaningful information regarding the impact of its noncomplying discharges. The *Hawaii's Thousand Friends* court found Honolulu's monitoring inadequate to assess adverse impact and thus required further study. This Court similarly concludes that Texaco must perform further study to determine the impact of its noncomplying discharge.

In an effort to avoid implementation of Dr. Means's plan, Texaco argues that Judge Roth did not envision a plan that would cost from $250,000 to $700,000. Texaco states that a more reasonable plan would be one which costs approximately $50,000 to implement. Texaco has not demonstrated that it does not have the resources to fund a $700,000 plan. In light of Judge Roth's finding that Texaco's failure to monitor the impact of its noncomplying discharges resulted in an economic benefit to the defendant of $900,000, implementation of a plan that would cost at most $700,000 does not trouble the Court.

Courts in the District of New Jersey have recognized that the implementation of monitoring is permissible equitable relief in a citizen suit under the CWA. *SPIRG v. Georgia–Pacific Corp.,* 615 F.Supp. 1419, 1428 (D.N.J.1985); *New Jersey Department of Environmental Protection and Energy v. Circuit Foil USA, Inc.,* 1993 WL 118195, at *7 (D.N.J. Apr.12, 1993) (discussing a prior order compelling defendant to conduct downstream sampling). Texaco points out that the *Georgia–Pacific* court expressed that plaintiffs carry a heavy burden to show that supplementary sampling is necessary given the comprehensive regulatory scheme. *Georgia–Pacific,* 615 F.Supp. at 1428.

The relief requested by NRDC can be distinguished from that sought in *Georgia–Pacific.* In *Georgia–Pacific,* the citizen group requested that it be allowed to conduct the monitoring program for a period of a

year. Here, any monitoring would be executed by Texaco personnel or a contractor selected by Texaco. Plaintiffs have not indicated any desire to impose themselves on this process in a physical sense. In addition, the monitoring program cannot be considered supplementary because Texaco is already required to monitor adverse impact.

Texaco argues that the Court should not require it to implement the Means studies because it will take too long to develop a monitoring plan. The studies, however, form the basis for developing an effective monitoring program. Texaco's shortsighted view undermines the purposes of the CWA. It has taken decades of pollution for the River to reach its current state. We cannot be deterred from understanding the impact of unlawful discharge merely because the ultimate goal may not be achieved until some time into the next century. We must look at these opportunities as a step by step approach, carefully and prudently finding our way to the ultimate goal of the CWA.

■ For all these reasons, the Court will order Texaco to execute the studies proposed by Dr. Means as a step toward the development of an effective monitoring program for determining the impact of future noncomplying discharges. By granting a NPDES permit, the citizens of Delaware have trusted Texaco to implement a self-monitoring program. As the Court previously explained, "the public interest would be vindicated by compliance with the permit and implementation of a monitoring program." *NRDC I*, 800 F.Supp. at 28. Texaco must carry out this responsibility with care to determine the impact of its noncomplying discharge on the River, the lifeblood of the region. By studying the environment using well-grounded scientific principles, Texaco will fulfill its obligation.

### B. *Determining Past Impact*

Having concluded that Texaco has an obligation to undertake meaningful scientific determination of the impact of its noncomplying discharges going forward, the Court turns to whether Texaco must measure the impact of its past nonconforming discharge. NRDC requests that the Court order Texaco to determine the impact of its noncomplying discharge since March 1993. At trial, the Court found "that there is ample evidence that many of the violations had an actual or potential adverse impact." *Id.* at 24. Texaco has not taken steps to ascertain the impact of its past noncomplying discharge.

The Court concluded that the scientific testimony established that the procedure to determine past impact is possible, but would not accurately reflect the impact of the past noncomplying discharges. Texaco contends that it should not be required to measure past impacts because the results would be too speculative. The testimony of Drs. Means and Livingston established, however, that any inaccuracy would inure to the benefit of Texaco.

Texaco also argues that it should not have to determine past impacts of nonconforming discharges because there is no evidence that they had any adverse impact. This assertion is based upon the dubious "bounding analysis" described by Dr. Markarian. The bounding analysis used a set of assumptions based upon preexisting information to determine that there is no adverse impact on the River from Texaco's noncomplying discharge. Dr. Means criticized this analysis because it used information gathered in a part of the River with different characteristics than the estuary. Tr. at 429. The other data used in the bounding analysis involved a different set of analytes. Tr. at 430. Dr. Means expressed concern over the combination of the data from two different sites to approximate a value for the area surrounding the final outfall, 001. *Id.*

Like the set of assumptions upon which the ENTRIX plan is based, the Court finds the bounding analysis suspect. Moreover, Dr. Means drew the distinction between loadings and concentrations to refute the assertion that there is no demonstrable harm to the River from Texaco's unlawful discharge. *See id.* at 426–29. Put in simple terms, although a pollutant can be diluted to reduce its concentration, a significant amount of that pollutant is still being discharged into the River. *Id.* at 429. As loadings are not measured at Outfall 001, there is no information

on which to base the assertion that there is no harm to the River.

At oral argument, the Court addressed the issue of remediation noting that NRDC failed to specify in its initial request for relief that Texaco remediate any damage caused by its violations of the permit. [D.I. 223 at 15]. Although remediation is not required under the terms of the permit, mitigation is. If there are persistent effects resulting from Texaco's past noncomplying discharge, argued NRDC, then Texaco has a responsibility to mitigate those effects.

■ After trial, Judge Roth made a factual finding that Texaco "has never evaluated the impact of its violations on the receiving waters." *NRDC I,* 800 F.Supp. at 27. Moreover, this finding prompted the conclusion that the "omissions have benefitted Texaco economically." *Id.* The Court addressed the irreparable harm and inadequacy of legal remedies for Texaco's violations of the permit. The Court concluded that:

> Harm or threatened harm to the environmental interests of plaintiffs' members—and the River itself—is ... irreparable. Moreover, the nature and extent of the harm will not be known until the monitoring provisions of the permit are complied with.

*Id.* at 27. The Court therefore indicated that Texaco must take steps to ascertain the impact of its nonconforming discharge. As such, requiring Texaco to determine the impact of its past noncomplying discharge fulfills the Court's directive.

Dr. Means's discussion of the chronic effects of short term exposure also supports this conclusion. The Court finds Dr. Means's statement credible and accurate. This finding furthers plaintiffs' argument that Texaco must take steps to mitigate the prospective effects of its prior noncomplying discharge. If the impact of the noncomplying discharge from January and February 1994 is persistent in the environment then Texaco must take steps now to mitigate its effect. Only then will Texaco fully bear its responsibilities under the permit.

## VI.   CONCLUSION

The Court's 1992 Opinion and 1993 injunction directed Texaco to comply with the permit and implement a monitoring program adequate to assess the nature and impact of its noncomplying discharge. The ENTRIX plan is not capable of carrying out that task. Accordingly, the ENTRIX plan does not meet the Court's instructions.

Dr. Means, corroborated by Dr. Livingston, presented a scientifically-valid plan to provide Texaco with the necessary background information to devise an appropriate monitoring program. Executing the protocols set forth by Dr. Means will not pose an undue burden on Texaco. Accordingly, the Court will order Texaco to establish a monitoring program with both quantitative and qualitative aspects as discussed in Dr. Means's report and outlined in Part II of this Opinion.

The Court further concludes that the original Opinion and Order required Texaco to ascertain the impact of its past nonconforming discharges. Having concluded that it is scientifically possible to do so, the Court will order Texaco to determine the impact of its nonconforming discharges since March 1993.

NOW, THEREFORE, IT IS ORDERED that:

In order to comply with the adverse impact provision of its NPDES permit and the Court's injunction, Texaco shall develop and implement a program to adequately measure the adverse impact of its future noncomplying discharges as discussed in Part II of this Opinion. Furthermore, Texaco shall determine the impact of its noncomplying discharges since March 1993 using the protocol discussed in Part II of this Opinion. The Court retains jurisdiction to insure compliance with the terms of this Order.